James REEVES, Appellant,

v.

The WESTERN COMPANY OF NORTH AMERICA, Appellee.

No. 04–92–00523–CV.

Court of Appeals of Texas, San Antonio.

Sept. 30, 1993.

Thomas F. Nye, Brin & Brin, P.C., Corpus Christi, George G. Brin, Brin & Brin, P.C., San Antonio, for appellant.

William H. Bruckner, James P. McInerny and Sylvia Davidow, Bruckner & Sykes, L.L.P., Houston, for appellee.

Before REEVES, C.J., and BUTTS and CHAPA, JJ.

## OPINION

BUTTS, Justice.

James Reeves, appellant, filed suit against The Western Company of North America, appellee, claiming negligence and gross negligence, intentional infliction of emotional distress, slander, slander per se, and invasion of privacy by placing appellant in a false light. After a jury verdict in favor of Reeves, the trial court granted Western's motion for judgment notwithstanding the verdict as to all the claims. Reeves brings twenty three points of error. We affirm.

The record shows that Western is an oil field service company. Reeves, an oil field worker, then 43 years old, had not worked

for a long time. The oil business had been in a steady decline for several years. His last employer declared bankruptcy. He collected unemployment checks and was issued food stamps for his family. In late July 1989, Reeves learned of a job opening for a sales representative at Western and interviewed with two executives, Julian Zamudio, the district manager in Alice, and Vince Whelan, the human resources director, in Houston. Favorably impressed, they wanted to hire Reeves. Both Western executives discussed the company policy with Reeves that his employment was conditioned on his passing a physical examination and a drug and alcohol screening test.[1] Reeves agreed and signed the "consent to toxicology tests" form.

Both Zamudio and Whelan indicated to Reeves that he would be employed; Whelan told Zamudio to have Reeves report for the tests, which were scheduled for August 2, 1989. The sales rep position would pay $2950. per month and offered additional benefits such as insurance and a company automobile.

On the morning of August 2 Reeves arrived at the Alice office and completed preemployment paperwork. The physical was scheduled for 2:00 p.m. Zamudio took Reeves to lunch, and no liquor was consumed. Zamudio returned to his office at 12:30 p.m. and Reeves left. The evidence does not reflect that anyone from Western was with Reeves from then until the doctor's appointment.

Dr. James Shaw, employed by Western to administer the preemployment physical and obtain the urine sample for screening, learned after the sample was examined in his office that Reeve's urine sugar level was high. He told Reeves that symptom was sometimes caused by diabetes. Reeves' response to the doctor was that he had been treated for diabetes several years before but thought it had been controlled. Dr. Shaw

told Reeves he would need treatment to pass Western's physical.

Dr. Shaw then instructed Reeves to obtain a treatment certificate from his own physician for medication to control the high blood sugar and to bring that doctor's release to work. That same day Dr. Shaw forwarded the sealed remainder of the urine sample for overnight delivery to ADL, Inc., the laboratory in California which performed Western's screening tests. Reeves met with his own doctor and drove back to Alice the following day with Dr. Lee Sang's certificate and release to work. Western instructed Reeves to report for his first day of work the following week.

On August 7, 1989, Reeves reported to work. Tommy Kuhn, Western's operations supervisor, who was taking Zamudio's place temporarily, issued Reeves a company car. Reeves went with an employee, Reymundo Renebato, and was introduced as the new Western employee.

However, later that same day Reeves was called back to the Alice office by Kuhn, who told him that the Houston personnel office had been informed by ADL that Reeves failed his screening test. He was told the results of the test were positive for alcohol and Western could not employ him. Reeves expressed disbelief, saying he had not consumed any drinks. Kuhn and Reeves telephoned Zamudio, who directed Reeves to call Whelan. Reeves asked Whelan to investigate further because he believed a mistake had been made.

Reeves requested that his wife be called to pick him up at the office; she refused to come in when she arrived. Reeves then asked Kuhn to go out to her car and explain to her, saying she would not believe her husband. At the request of Reeves, Kuhn obliged, telling Mrs. Reeves that Western could not hire Reeves because the lab had found alcohol in the urine sample. She expressed shock, saying her husband did not

---

1. It is not disputed that it has been Western's policy since 1985 to require all prospective employees to undergo a preemployment physical examination and a drug and alcohol screening.

The current employees were also compelled to undergo the screening. Instructed to list all drugs and medications he was taking since evi-

drink.[2] Kuhn told her the reading of the alcohol content was .4%. When she asked what that meant, Kuhn told her that showed consumption of more than one or two beers. The lab report in the record reveals the actual figure was 0.04%. It is undisputed that only Kuhn, Reeves, and Mrs. Reeves were present at that conversation. Mrs. Reeves testified this was like being told her husband was an alcoholic, not honest, and not a Christian.

The record further reflects that Whelan's personnel office did request a second confirmatory test to ensure results were accurate and testing properly done. The August 15, 1989 letter from ADL Laboratory stated the second test again showed positive alcohol results. The letter went on to state that alcohol can be produced by microbial breakdown of sugar, and it was possible that the alcohol did not come from consumption. However, continued the letter, "there is no way to distinguish from which of these two sources the alcohol present in the urine specimen came." The letter suggested any potential health problem should be investigated. It is not disputed that Dr. Shaw instructed Reeves to see his own doctor for any health problems and that Reeves had gone to that doctor.

Western did not take any further action or inform Reeves of the second letter. Whelan testified the letter changed nothing because it did confirm that the original test was accurate and because the laboratory stated there was no way to determine the source of the alcohol present in the specimen. And "Reeves had already indicated to me [when he telephoned Whelan for reconsideration] that he had consulted with his personal physician and that there was nothing wrong with him."

After the jury returned its verdict, the trial court granted judgment notwithstanding the verdict. The trial court's express reason for the ruling on the negligence theory was that, as a matter of law, Western owed no legal duty to Reeves to disclose to him the results of the screening tests. The court also

granted judgment notwithstanding the verdict on the other claims.

### The Negligence Claim

The jury answered the negligence questions affirmatively, finding that Western was negligent in the manner in which it secured, tested and/or reported the test results of the urine sample; that Western's negligence was the proximate cause of injury or damage to Reeves; and that Western was grossly negligent.

Points of error one through five address alleged error in granting judgment n.o.v. on the negligence findings, contending that a legal duty did exist and the evidence was legally sufficient to support the affirmative findings. *See* Tex.R.Civ.P. 301.

■ The common law doctrine of negligence consists of three elements: 1) a legal duty owed by one person to another; 2) a breach of that duty; and 3) damages proximately resulting from the breach. *Greater Houston Transp. Co. v. Phillips*, 801 S.W.2d 523, 525 (Tex.1990). The threshold inquiry in a negligence case is duty. *Id.* The plaintiff must initially prove the existence and violation of a legal duty owed to him by the defendant to establish tort liability. *See Abalos v. Oil Dev. Co. of Texas*, 544 S.W.2d 627, 631 (Tex.1976); *accord El Chico Corp. v. Poole*, 732 S.W.2d 306, 311 (Tex.1987); *Otis Eng'g Corp. v. Clark*, 668 S.W.2d 307, 309 (Tex.1983).

■ No evidence points must and may only be sustained when the record discloses: (1) a complete absence of evidence of a vital fact; (2) the court is barred by rules of law or of evidence from giving weight to the only evidence offered to prove a vital fact; (3) the evidence offered to prove a vital fact is no more than a mere scintilla; and (4) the evidence established conclusively the opposite of the vital fact. *Juliette Fowler Homes, Inc. v. Welch Assocs.*, 793 S.W.2d 660, 666 n. 9 (Tex.1990); Calvert, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361, 362–63 (1960).

---

dence of them would surface in the testing, Reeves listed demerol and darvocet.

2. On the other hand, Reeves acknowledged he did occasionally take a drink.

■ Judgment notwithstanding the verdict is appropriate where, even if all the allegations are proved, a legal principle precludes recovery. R. McDonald, Texas Civil Practice, *Judgments*, § 27.70 (1992). *See e.g., Stevenson v. Koutzarov*, 795 S.W.2d 313, 318–20 (Tex.App.—Houston [1st Dist.] 1990, writ denied) (court erred in not granting judgment n.o.v. because the causes of action of invasion of privacy, intentional infliction of emotional distress, and conspiracy to commit these torts were barred by statute of limitations); *City of Dallas v. Moreau*, 718 S.W.2d 776, 779–82 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.) (court erred in failing to grant judgment n.o.v. on wrongful termination action because of express city charter provision, because City was performing governmental function, and because plaintiff had no cause of action for libel); *Graphilter Corp. v. Vinson*, 518 S.W.2d 952, 955 (Tex.App.—Dallas 1975, writ ref'd n.r.e.) (illegality of contract appears from record as a matter of law).

### Legal Duty

■ It is Reeves' contention that Western owed a legal duty to him not to conduct the screening tests negligently and not to be negligent in the manner in which it reported the test results. Reeves expressly states that the legal duty is owed to him only "as a job applicant," not as an employee at will. Thus, there is no special relationship arising from a contract between the parties. *See Aranda v. Insurance Co. of N. Am.*, 748 S.W.2d 210, 212 (Tex.1988). But it is significant that even if Reeves did have the status of an employee, an employment situation which is governed by the employment at will doctrine does not of itself create a special relationship. *Wal–Mart Stores, Inc. v. Coward*, 829 S.W.2d 340, 344 (Tex.App.—Beaumont 1992, writ denied).

Plainly there is no evidence that Western conducted the screening tests which resulted in Reeves not being employed. It is clear that Dr. Shaw's preliminary test simply recognized there was sugar present in the blood, and Reeves was advised to see his own doctor for possible treatment and for a medical release to work, which he promptly did. The company executives implied no other meaning to Dr. James' preliminary test. In fact they asked Reeves to report for work the following week, and they waited for the drug and alcohol official screening test results from ADL, the California laboratory. Negligence, if any, in conducting the screening tests, would be that of the laboratory, ADL. However, Reeves states specifically that he "does not contest the lab's testing procedure."

As further explained by Reeves, "the trial and appeal of this case focus on Western's duty to fully disclose all test results." He argues, first, a duty existed under "general common law concepts and sound public policy." He claims that Western was required to fully and non-negligently *report the results of all tests to Reeves, including the possible reasons for the positive alcohol reading.* Second, he says even if no duty initially existed to report the results, *a duty was created when Western requested the second screening which disclosed a possible alternative basis for the alcohol content.*

Reeves acknowledges that no cause of action has been recognized in Texas imposing a legal duty upon a *prospective employer* to report drug and alcohol screening test results to a *job applicant*. He asks that the *new legal duty* be recognized by this court.

He analogizes the relationship between Western and Reeves to that of the actual employer in *Otis Eng'g Corp., supra*, and its actual employee who was intoxicated on the job, which gave rise to a foreseeable risk of injury when the employer put the plainly intoxicated employee in his car in the company parking lot to drive home on a public road. That case is inapposite. Under those circumstances, a special relationship arose and created a legal duty on the part of the employer to exercise reasonable care by not placing the intoxicated employee behind the wheel of his car on a public highway with the foreseeable risk of injury to others.

No such special relationship existed in the present case, which is in a preemployment posture. In fact, Reeves specifically entreats this court not to consider any employment status, and we agree there was no employ-

ment relationship between Western and Reeves.

The job applicant, Reeves, sued the prospective employer, Western, for negligently failing to report drug/alcohol test results—specifically the testing lab's explanation that glucose in the blood could be a possible cause of the alcohol content. Reeves has offered no cases where this cause of action has been recognized under similar facts, and we have found none. Under the facts of this case, even if this plaintiff was not informed of the results, there exists no negligence cause of action against the prospective employer, Western. *Compare Lotspeich v. Chance Vought Aircraft,* 369 S.W.2d 705 (Tex.Civ. App.—Dallas 1963, writ ref'd n.r.e.) (neither examining physician hired by prospective employer nor prospective employer owed any duty to job applicant to discover presence of tuberculosis, hence, no actionable negligence in their failure to do so).

Moreover, the record discloses that even if there existed an alternative reason for the alcohol content, which was not established at trial, but was characterized only as a *possibility* by ADL, Reeves had previously been made aware of and acted on that possibility, going to his own doctor for treatment and bringing back a certificate and a release to work. He saw Dr. Sang after being informed by Western's local physician in Alice, Dr. Shaw, of a potential health problem several days before the lab test results arrived. Additionally, a statement in the laboratory's second letter suggesting a mere possibility of a physical ailment is not the same as actual knowledge of a specific condition discovered during physical examination. *See Dornak v. Lafayette Gen. Hosp.,* 399 So.2d 168, 170 (La.1981) (employer had duty to disclose employee's tubercular condition discovered during preemployment physical but unknown to employee). As emphasized by the laboratory, it was impossible to determine the source of the alcohol content in Reeve's blood.

The question of legal duty owed by the defendant to the plaintiff is a matter of law. We agree with the trial court in this case that this plaintiff failed to prove the initial element of a negligence claim: legal duty. Therefore, the plaintiff did not establish the basis for recovery in tort for negligence. Additionally, recovery for negligence is precluded by the legal principle that no duty is owed by a prospective employer to a job applicant to disclose results of screening tests for drugs or alcohol, i.e. no cause of action arises. In granting judgment notwithstanding the verdict, the court properly disregarded the findings of negligence, proximate cause, and gross negligence. The points of error are overruled.

### Intentional Infliction of Emotional Distress

Points of error six through nine deal with the claim of intentional infliction of emotional distress and assert that the trial court erred in granting judgment n.o.v. as to that claim.

■ Until recently, only certain courts of appeals in Texas had recognized the independent cause of action. Our supreme court has now expressly recognized the tort of intentional infliction of emotional distress. *Twyman v. Twyman,* 855 S.W.2d 619 (Tex.1993). To recover under this tort, the plaintiff must prove that 1) the defendant acted intentionally or recklessly, 2) the conduct was "extreme and outrageous," 3) the actions of the defendant caused the plaintiff emotional distress, and 4) the resulting emotional distress was severe. *Id.* at 621. *See* RESTATEMENT (SECOND) OF TORTS § 46 (1965).

The jury found that Western intentionally failed to fully report the results of the urine test to Reeves; that Western's intentional failure to fully report the test results was extreme and outrageous conduct; and that Western's failure to fully report the test results caused Reeves to suffer emotional distress.

Jury questions number four, five, and six address emotional distress caused by only one circumstance: Western's intentional failure to fully report the test results to Reeves.

■ We first hold that since there was no legal duty to disclose the test results to the job applicant under the facts in the present case, the intentional failure to disclose test results can furnish no basis for the emotional distress claim.

■ Assuming arguendo that the cause of action would lie in this case, we have examined the record to determine whether there is legally sufficient evidence to support the finding of extreme and outrageous conduct, a necessary element of the tort. A trial court may render judgment notwithstanding the verdict if there is no evidence supporting one or more jury findings on issues necessary to liability. TEX.R.CIV.P. 301. In determining a "no evidence" question, however, a court must consider only that evidence and reasonable inferences therefrom tending to support the jury findings, disregarding all contrary evidence and inferences. *Best v. Ryan Auto Group, Inc.*, 786 S.W.2d 670, 671 (Tex.1990) (per curiam). If the court finds more than a scintilla of competent evidence (some evidence) to support the jury's findings, it will reverse. *See Navarrette v. Temple Indep. Sch. Dist.*, 706 S.W.2d 308, 309 (Tex.1986).

■ Even had such a legal duty existed under the facts of the present case, the evidence fails to establish the element of "extreme and outrageous" conduct by Western. The tort of intentional infliction of emotional distress requires that the forbidden conduct exceed all possible bounds of decency and be utterly intolerable in a civilized community. *Dean v. Ford Motor Credit Co.*, 885 F.2d 300, 306 (5th Cir.1989) (supervisor intentionally placed checks in employee's purse to make it appear she was a thief). RESTATEMENT (SECOND) OF TORTS § 46, comment d describes conduct reaching the level of "extreme and outrageous conduct" necessary for intentional infliction of emotional distress:

It has not been enough that the defendant has acted with an intent which is tortious or even criminal, or that he has intended to inflict emotional distress, or even that his conduct has been characterized by "malice".... Liability has been found only where the conduct has been so outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community.

In *Diamond Shamrock Ref. Co. v. Mendez*, 844 S.W.2d 198 (Tex.1992), the plaintiff charged the tortious conduct occurred not by the employer terminating him but by falsely depicting him in the community as a thief. The court delineated the necessary standard to prove extreme and outrageous conduct and held the plaintiff failed to show the defendant met it. The plaintiff had been terminated and accused of stealing. The court stated it was not required to condone such behavior by an employer in order to hold the conduct did not reach the level of "outrageousness." It further noted that even when termination is accompanied by such employer behavior, "there would be little left of the employment-at-will doctrine if an employer's public statement of the reason for termination was, so long as the employee disputed that reason, in and of itself some evidence that a tort of intentional infliction of emotional distress had been committed." *Id.* at 202; *see Wornick Co. v. Casas*, 856 S.W.2d 732, 736 (Tex.1993).

In the same vein, if a mere job applicant disputes the reason for his non-employment, declaring the results of a drug/alcohol screening test doubtful because he denies consuming any alcohol, that reason and denial cannot, in and of itself, be **some evidence** that a tort of intentional infliction of emotional distress has been committed. Obviously, this employer could require a prospective employee to take the test as a condition of employment. The test results showed alcohol content; it was impossible to determine the source of that alcohol content. The prospective employer followed its established policy. The proof offered by Reeves failed to demonstrate "extreme and outrageous conduct", as required by *Twyman* and the Restatement (Second) of Torts.

■ The restatement of torts further recognizes that the conduct, although it would otherwise be extreme and outrageous, may still be privileged under the circumstances. The actor is never liable, for example, where he has done no more than to insist upon his legal rights in a permissible way, even though he is aware that such insistence is certain to cause emotional distress. RESTATEMENT (SECOND) OF TORTS § 46, comment g. Under the facts of this case the prospective employer exercised its legal rights in a permissible way.

■ We conclude that the conduct of Western in this case was, as a matter of law, not outrageous. The trial court did not err in disregarding the findings and granting judgment notwithstanding the verdict of the jury on the claim of intentional infliction of emotional distress. The points are overruled.

### Slander

■ To constitute actionable slander a defamatory statement must be orally communicated without legal excuse. The elements are 1) an oral statement; 2) which is false; 3) which is published to a third person; and 4) which refers to an ascertainable person. The statement must not be protected by a qualified or conditional privilege. *See Jackson's Indus. Supplies, Inc. v. Cochran,* 809 S.W.2d 802, 806 (Tex.App.—Beaumont 1991, no writ); *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d 377, 380 (Tex.App.—Texarkana 1989, no writ); *Bergman v. Oshman's Sporting Goods, Inc.,* 594 S.W.2d 814, 815–16 (Tex.Civ.App.—Tyler 1980, no writ). Western presented its defenses of both *truth* and *privilege.*

■ The threshold consideration is a statement's falsity. Truth is an absolute defense to a claim of slander. *Jackson's Indus. Supplies, Inc. v. Cochran,* 809 S.W.2d at 806; *Frank B. Hall & Co. v. Buck,* 678 S.W.2d 612, 623 (Tex.App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.), *cert. denied,* 472 U.S. 1009, 105 S.Ct. 2704, 86 L.Ed.2d 720 (1985).

By points of error ten through sixteen Reeves argues that the trial court erred in granting judgment n.o.v. on the jury findings of slander, slander per se, malice, and proximate cause of injury to Reeves.

■ The trial court may enter judgment notwithstanding the verdict if material jury findings are without support in the evidence or are contrary to the conclusive evidence. The reviewing court must view all the evidence in the light most favorable to the jury's findings. *Pate v. Southern Pac. Transp. Co.,* 567 S.W.2d 805, 807 (Tex.Civ.App.—Houston [14th Dist.] 1977, writ ref'd n.r.e.).

■ When, as in the present case, the trial court states no reason why the judgment notwithstanding the verdict regarding slander was granted, and the motion for judgment n.o.v. presents multiple grounds upon which the motion should be granted, the appellant has the burden of showing that judgment cannot be sustained on any of the grounds stated in the motion. *Fort Bend County Drainage Dist. v. Sbrusch,* 818 S.W.2d 392, 394 (Tex.1991); *Monk v. Dallas Brake & Clutch Serv. Co.,* 697 S.W.2d 780, 783–84 (Tex.App.—Dallas 1985, writ ref'd n.r.e.).

■ The evidence to show slander focused on Tommy Kuhn as the communicator in three conversations. The first was when Kuhn informed Reeves in his office that he had failed the alcohol test, "We got the results back on the drug screening test and they were positive." No other person was present, although Reeves says there were others in the outside office who may have overheard. This was clearly not slander since the matter was true and neither defamatory or false. In addition, the statement was not made to a third person.

■ Publication is either a negligent or an intentional act that communicates a defamatory matter to a person other than the person defamed. *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 921–22 (Tex. App.—Corpus Christi 1991, writ dism'd w.o.j.); *Baubles & Beads v. Louis Vuitton, S.A.,* 766 S.W.2d at 380; *First State Bank of Corpus Christi v. Ake,* 606 S.W.2d 696, 701 (Tex.App.—Corpus Christi 1980, writ ref'd n.r.e.).

■ Kuhn's second conversation was with Reeves' wife in her car, as noted above, at the **request** of Reeves. He related to her that Reeves failed the alcohol test, the results came up positive, and there was nothing he could do about it personally. That Reeves failed the test and the results came up positive are true underlying facts. That Kuhn indicated a higher alcohol reading, 0.4%, was a variance and of secondary importance. The percentage would not affect the underlying truth: the lab report of alcohol in the urine sample was the reason Reeves could not be employed. *See McIlvain v. Jacobs,*

794 S.W.2d 14, 16 (Tex.1990) (sets out test for determining substantial truth of a given communication). This communication only to the wife was not slander.

■ In addition, the communication was not slander because it was privileged. A conditional or qualified privilege applies to communications made in good faith on any subject matter in which the author has an interest, or with reference to which he has a duty to perform to another person having a corresponding interest or duty. *Associated Tel. Directory Publishers, Inc. v. Better Business Bureau of Austin, Inc.*, 710 S.W.2d 190, 192 (Tex.App.—Corpus Christi 1986, writ ref'd n.r.e.); *Tucker*, 806 S.W.2d at 921–22. *See Smith v. Holley*, 827 S.W.2d 433, 436 (Tex.App.—San Antonio 1992, writ denied); *Dun and Bradstreet, Inc. v. O'Neil*, 456 S.W.2d 896, 898–99 (Tex.1970) (privilege applied to false report of bankruptcy filing to all subscribers to credit reporting agency recently inquiring about person alleged to have filed for bankruptcy). Even if a communication is false, it may still be privileged, and actionable slander would not lie. In this case the defense of privilege was claimed in the motion for judgment n.o.v. and also at trial. Whether a conditional or qualified privilege exists is a question of law for the court. *Houston v. Grocers Supply Co.*, 625 S.W.2d 798, 800 (Tex.App.—Houston [14th Dist.] 1981, no writ).

■ A communication loses its privileged character when it is made to those outside of the interest group in question. *See Perry Bros. Variety Stores, Inc. v. Layton*, 119 Tex. 130, 25 S.W.2d 310, 313 (1930) (privileged character of communication lost when made in presence of other customers in store where customer charged with shoplifting).

■ This was a subject in which the supervisor, Kuhn, had an interest, he made the statements to Reeves' wife, who was within the "interest group" and Reeves specifically requested that Kuhn give her the reason for not being employed. Kuhn would not have gone out to the car and talked with her except for Reeves' request. The statements were made in good faith regarding why her husband could not be hired. The

wrong percentage reading (0.4%) communicated to the wife did not cause the communication to lose its privileged character. Further, when the plaintiff invites, requests, or consents to a statement, an action for defamation is barred. *See Smith v. Holley*, 827 S.W.2d 433, 436–38 (Tex.App.—San Antonio 1992, writ denied) regarding qualified privilege and consent.

Kuhn's third conversation occurred when Paul Bommer, who had his own oil and gas business and was a friend of Reeves, telephoned for information after talking with Reeves. Kuhn testified that Bommer indicated he knew about the situation from Reeves and asked a few questions, but Kuhn said he "really couldn't tell him much about it." Bommer testified and confirmed that Reeves had told him Western "fired" him for failing a physical because of alcohol in a urine sample. He volunteered to Reeves to get an explanation and telephoned Western. When questioned, he agreed that no one at Western made any defamatory or derogatory statements about Reeves. He testified that reputation is important in the oil and gas industry; however, he did not state that any specific person, including himself, in the oilfield business heard any defamatory statements about Reeves.

Reeves testified that he believed there were other salesmen in the office who heard Kuhn tell him about the test results, but named only Renobato. However, no one testified at trial he was privy to or overheard the conversation. In any event, the communication was true as well as privileged, as discussed above.

Reeves also told about the Kuhn–Mrs. Reeves conversation at the car, which is discussed above. Reeves testified generally about statements being made in the oilfield. He indicated "they" wondered why he was back looking for a job just after he got a job at Western. He said,

"People were inquiring, they were wondering why. I didn't go out and tell them but word of mouth through the grapevine, oilfield is a close-knit people. Things travel. And a man that drinks in an oilfield, he can't do his job right. So, that put me in a

position of that everybody knows me but they're not sure about you anymore."

He was asked the general question what it meant to have the word get around in the oilfield patch that you got fired because you failed an alcohol screening test. Reeves replied, "It'd be very hard to get a job with anybody."

We have examined the record and find no evidence that defamatory statements were published by Western to the oilfield industry or community. References were made to the "grapevine" in that business, to unnamed "people" who knew about the test and presumed Reeves was an alcoholic, to "word getting around," but no people were identified, nor did anyone testify that Western published a defamatory or false statement about Reeves.

Reeves testified, "It'd be very hard to get a job with anybody." "[P]eople were wondering" why he did not have a job at Western. But no prospective employer testified to rejecting Reeves because of the publication of a defamatory statement. To the contrary, the evidence reflected that Reeves obtained work with Bommer in a supervisory capacity in the oilfield industry shortly after this incident and was working at the time of trial.

■ In this connection, no prospective employer testified that it rejected Reeves as an employee because he was compelled to publish a defamatory statement about himself. Nor is there specific testimony from a prospective employer concerning Reeves' self-compelled disclosure of a defamatory statement. We note that this doctrine has not been recognized by all the Texas courts. Under the doctrine of self-compelled publication, which may negate consent to publication, a plaintiff may recover for slanderous statements to which he has consented only if circumstances indicate defamatory communication to a third party is likely or a reasonable person would recognize the unreasonable risk of such communication. *See First State Bank of Corpus Christi v. Ake*, 606 S.W.2d at 701; *Chasewood Const. Co. v. Rico*, 696 S.W.2d 439, 444–46 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). In the present case, there is no evidence to show com-

pelled self-publication by Reeves. Speculation about possible consequences if a prospective employer knew Reeves did not pass the alcohol test will not support this claim.

Reeves asserts that the statement of the percentage of alcohol reading, 0.4%, was made to his wife with malice. While it is true that a conditional or qualified privilege may be lost upon a showing of malice, *Ramos v. Henry C. Beck Co.*, 711 S.W.2d 331, 335 (Tex.App.—Dallas 1986, no writ), in the present case it has been determined there is no evidence to show that Kuhn acted with knowledge the percentage was actually 0.04%, and the evidence demonstrates his good faith in the invited discussion with Mrs. Reeves. Most important, and as previously discussed, the statement as to why Reeves could not be hired was substantially true, and the percentage amount was simply a variance of the basic truthful statement which did not alter the underlying truth.

Moreover, the definition of malice submitted to the jury was:

"Malice" involves an evil intent or motive arising from spite or ill will; personal hatred or ill will or culpable recklessness or a willful and wanton regard [sic] of the rights and interest[ ] of the person defamed; publishing without justifiable cause, *any written or printed matter* which is injurious to the character of another; where defamation is concerned, acting in bad faith and with knowledge of falsity of statements. (emphasis added).

Of course, there was no allegation or evidence of publication of defamatory written or printed matter in this case. There was no evidence of any kind to reflect that Kuhn harbored any evil intent, ill will, or spite when he talked with Mrs. Reeves at her husband's insistence. Thus there was no evidence on which to base the jury finding that malice was present in an *oral* communication. Applying the required standard of review, we find the evidence is legally insufficient to support the finding that Western committed slander.

■ If a statement unambiguously and falsely imputes criminal conduct to the plain-

tiff, it is defamatory per se. *Ramos v. Henry C. Beck Co.*, 711 S.W.2d at 334. An ordinary person would draw a reasonable conclusion that the complaining party was charged with a violation of criminal law. *Hornby v. Hunter*, 385 S.W.2d 473, 475 (Tex. Civ.App.—Corpus Christi 1964, no writ). There is no allegation or proof of imputation of criminal conduct in this case.

An exception to this general rule, which is as well settled as the general rule, is that words not otherwise actionable per se sometimes become so if spoken of a person engaged in a particular business or profession charging him with fraud, indirect dealings, or incapacity, and tending to injure him in his trade, occupation, employment, or business. *West Texas Utils. Co. v. Wills*, 135 S.W.2d 138, 140 (Tex.Civ.App.—Austin 1939, no writ). If the imputation is false, it is per se slanderous. *Id.* at 141. Slander per se is slander so obviously harmful to a plaintiff that it requires no proof of special damages because the communication would tend to injure a party in his occupation. *Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d 369, 374 (Tex.1984). We have held there is no evidence of slander. Likewise, there is no evidence of slander per se. The points of error are overruled.

In points of error seventeen and eighteen Reeves argues generally that it was error for the trial court to grant a judgment n.o.v. as to his claim of invasion of right of privacy. Texas recognized the cause of action in *Billings v. Atkinson*, 489 S.W.2d 858 (Tex.1973), which involved tapping a telephone wire going into Billings' home. The supreme court in *Industrial Found. of the S. v. Texas Indus. Accident Bd.*, 540 S.W.2d 668 (Tex. 1976), *cert. denied*, 430 U.S. 931, 97 S.Ct. 1550, 51 L.Ed.2d 774 (1977), noted there are four distinct torts under invasion of privacy, one of which is "[p]ublicity which places the plaintiff in a false light in the public eye." *Id.* at 682. It is maintained that Reeves was placed in a false light which would be highly offensive to a reasonable person; that Western had knowledge of or acted in reckless disregard as to the falsity of the publicized matter; that Western communicated the matter to the public at large or to so many

persons the matter became one of public knowledge; and that the statement published was false or at least capable of conveying a false impression about Reeves. The discussion above regarding dissemination of false statements applies equally in regard to publicity by Western which placed Reeves in a "false light" in the public eye. Reeves argues that he was refused employment "on the pretext that large amounts of alcohol were detected in his urine." This assertion does not comport with the evidence; rather the evidence showed that any job applicant at Western whose urine was tested as having any alcohol content was refused employment. No evidence supports Reeves' statement. That alcohol was detected in his urine was not refuted at trial.

It is further maintained that the personnel office, and Whelan in particular, knowing that "people in Alice" believed the Reeves failed the test because he had been drinking, should have clarified this matter, apparently by disclosing to the public that there could be another possible reason for alcohol in urine. Reeves' allegations concerning Kuhn's statements have been discussed above. There is nothing in the record showing that Kuhn "recklessly disregarded Reeves' rights," as alleged.

There is no specific evidence that Western publicized the test results to the public. Reeves cites no authority which upholds the theory of "false light" when a potential employer discloses the reason for the non-employment to the applicant and then to the applicant's wife at his request. For a statement to be published for false light purposes, it must be disseminated to a significant number of individuals or to the public at large. *Moore v. Big Picture Co.*, 828 F.2d 270, 273–74 (5th Cir.1987). In addition to the first requirement, the statement must be more than merely false; it must also be highly offensive. *See Wood v. Hustler Magazine, Inc.*, 736 F.2d 1084 (5th Cir.1984), *cert. denied*, 469 U.S. 1107, 105 S.Ct. 783, 83 L.Ed.2d 777 (1985); *Clarke v. Denton Publishing Co.*, 793 S.W.2d 329, 331 (Tex.App.— Fort Worth 1990, writ denied). The same defenses applying to slander apply to false light. Thus, even if there had been publica-

tion by Western, the privilege defense, discussed above, would apply to the claim of false light in this case, as would the consent to publication. *See Wood v. Hustler Magazine, Inc.*, 736 F.2d at 1089.

■ We hold the court did not err in granting judgment n.o.v. as to false light findings. The trial court pointed out that widespread dissemination or publicity was not shown. In addition, there is no evidence of falsity and extreme offensiveness. The elements of proof of the tort have not been met. We have previously held that any statement by Western was protected by privilege, and there was no evidence of malice to invalidate the privilege. The points are overruled.

### Damages

Reeves next contends that judgment n.o.v. was improperly granted as to actual damages. The jury found damages for mental anguish and suffering in the past and future, injury to reputation in the past and future, lost of earning capacity in the past, and damage to Reeves' business reputation and awarded a total of $439,490.

We have held that the trial court correctly granted judgment n.o.v. as to negligence, intentional infliction of emotional distress, slander, and false light because there is legally insufficient evidence to support those causes of action. Because liability had not been established as a matter of law, the trial court correctly disregarded and set aside the damages findings.

■ The trial court further granted judgment n.o.v. as to exemplary damages. This was proper since no liability supported the findings of actual damages, which, in turn, must be proved to support the finding of exemplary damages. *See Texas Nat'l Bank v. Karnes*, 717 S.W.2d 901, 903 (Tex.1986). In addition, as previously discussed, Western had no legal duty to fully report test results to Reeves and, therefore, could not be liable for negligence or gross negligence in failing to so report. For lack of legal duty in this case, Western is not liable for intentional infliction of emotional distress or any derivative exemplary damages.

A finding of malice is essential to support an award of punitive damages for slander and false light. *See Leyendecker & Assoc., Inc. v. Wechter*, 683 S.W.2d at 375. We have held that slander and false light were not proved, and judgment n.o.v. on those causes was properly rendered. Further, we held that malice was not shown. Exemplary damages deriving from those two claims are therefore unsupported. Points of error 19, 20, and 21 are overruled.

In point of error 22, Reeves states that his signing the consent to take the test and release form of Western, absolving the company of liability, is against public policy. The release was a general one and did not mention any specific claim (release from "all claims and causes of action resulting" from the tests). Because of our disposition of the case and the liability issues, we have no need to determine whether Western was released from all liability when Reeves consented to the test.

In his last point of error, Reeves disavows that the employment-at-will doctrine applies to any of his causes of action. It is not necessary to belabor the assertion; the subject was discussed earlier. Further, that doctrine is not determinative of the outcome of the case.

Because we have found that the trial court properly granted the judgment n.o.v. in all respects, it is not necessary to address Western's two cross-points: that an erroneous jury charge on damages was submitted and there was factually insufficient evidence on the questions of slander and/or false light.

The judgment is affirmed.

CHAPA, Justice, concurs in the result.