Randy CALHOUN, Appellant,

v.

CHASE MANHATTAN BANK (U.S.A.), N.A., Appellee.

No. 01–94–00759–CV.

Court of Appeals of Texas, Houston (1st Dist.).

Aug. 3, 1995.

Rehearings Overruled Oct. 5, 1995 and Nov. 22, 1995.

David F. Beale, Houston, for appellant.

Malcolm Williams, Houston, for appellee.

Before OLIVER–PARROTT, C.J., and TAFT and O'CONNOR, JJ.

## OPINION

O'CONNOR, Justice.

We answer the following questions raised by this appeal: Did the trial court err in submitting the instruction on the qualified privileged? No. Did the jury err in failing to find evidence to support plaintiff's DTPA cause of action? No. Did the trial court err in refusing to award prejudgment interest? Yes. We reform the judgment, and as reformed, we affirm.

### Fact summary

Randy Calhoun sued Chase Manhattan Bank for wrongful dishonor of a check, violations of the Deceptive Trade Practices Act,

libel and asked for actual damages, statutory damages under the DTPA, punitive damages of $100,000, attorney fees, prejudgment and post-judgment interest, and costs of suit.

In its answer, Chase asserted a number of affirmative defenses: (1) its statements to the credit reporting agencies regarding Calhoun's credit history were truthful; (2) its statements to the credit reporting agencies were entitled to the qualified or conditional privilege that attaches to communications to credit reporting agencies made in good faith; (3) Calhoun consented to the exchange of credit information; and (4) if the check was wrongfully dishonored, it was the result of a bona fide mistake.

The jury found Chase did not engage in false, misleading, or deceptive acts, did not engage in any unconscionable action or course of action that was a producing cause of damages to Calhoun, and did not libel Calhoun. The jury did find Chase wrongfully dishonored Calhoun's check, and awarded Calhoun $35,000 in damages.

The parties have different views of the evidence, which we summarize below.

### Calhoun's Version

On November 9, 1985, Calhoun wrote a $3,000 check on his Chase Visa account as a part payment for a Cadillac Eldorado. On November 14, 1985, Chase rejected the check and returned it for insufficient funds.[1] A few days later, Calhoun received a letter from Chase explaining why the check was returned. On November 20, 1985, he spoke with Chase employee Deborah Merritt, a customer service representative. Merritt told Calhoun his account had been charged twice for the same airline tickets on November 15 and she would remove the second charge. Calhoun testified Merritt told him she would call the Cadillac dealer and assure them the check would be processed if they resubmitted it. After talking with her, Calhoun called the

Cadillac dealer to confirm they would resubmit the check. On November 25, Chase rejected the check for a second time. On December 3, the Cadillac dealer called to tell him the check bounced a second time. Calhoun paid for the car with a personal check.

Calhoun called Merritt again. He told Merritt he was unhappy with Chase's service and bouncing the check for the second time was absurd. He told Merritt he wanted to close his account at Chase. Merritt gave him the telephone number to call to close the account.[2]

Calhoun talked with another Chase employee John Lopez, a collective supervisor, and explained the problems with his account and said he wanted to close his account and get a refund on his membership fee. Calhoun claimed Lopez told him to cut his credit card, make a written summary of the discussion, and send it to him. Calhoun instructed his secretary to cut up the card and return it. Calhoun testified he wrote Chase on two separate occasions and instructed Chase to close his account.

Chase did not close the account and Calhoun started receiving letters from Chase telling him there was a $1,553.10 balance due on the account. Calhoun said he did not pay the $1,553.10 due on his account because he made an agreement with Lopez that the $45 membership fee would be deducted and he would not pay interest.

Calhoun received notice from another credit card company, Diner's Club, his account had been canceled. He tried to have the account reinstated but his request was rejected. Calhoun received a letter from Diner's Club which said its decision not to reinstate his credit card was based on a credit report from the Credit Bureau of Greater Houston.

After being rejected by Diner's Club, Calhoun secured a copy of his credit report. In

---

1. When he talked to employees of the bank, no one told him the check was refused because an outstanding bill had not been paid.

2. The issue of whether Calhoun closed the account or Chase closed the account was a critical issue for the DTPA cause of action. Chase claimed it closed the account because Calhoun

did not pay an outstanding charge of $1,600. Chase reported that it closed the account on its credit report. Calhoun claimed he made a written request to close the account and when Chase claimed to have closed the account it made a false credit report.

the report, Calhoun found misstatements about his payment history on his Chase account. The report, according to Calhoun, stated his account went 90 days past due three times, when it only went 90 days past due once and the amount owed was incorrect.

The credit report caused Calhoun problems with his company, Summit Pipeline & Producing Company, when it applied for a letter of credit from Southeast Bank. When Southeast Bank received a copy of Calhoun's personal credit report, it denied Summit's request for a letter of credit. Without the letter of credit, Summit could not guarantee its payment to potential customers. Calhoun blamed Summit's loss of business on the false credit reports made by Chase. Calhoun testified he lost $20 million in gas purchases in 1986 because of the credit report. Calhoun contends his winter 1985 profits were about $550,000 more than his winter 1986 profits. On cross-examination, Calhoun admitted the natural gas industry deteriorated from 1984 through 1990 because too much gas was available and prices were steadily declining.

Leonard Carr, an expert for Calhoun, testified a credit report which shows a delinquent account and the account closed by Chase, would have a "severe, negative impact" on whether a gas producer would sell gas to Calhoun. Steve Hacker, owner of Phentex, a company doing business with Calhoun, stated he would not renew a contract with Calhoun because of the credit problems he had with Chase.

### Chase's Version

Chase presented a different version of the events. In 1984, Calhoun received a Chase Visa Gold Card with a $5,000 line of credit, which included $3,000 for cash advances. All charges to the account over a certain amount (either purchase charges or cash advances) require advance approval. When a merchant called for advance approval on a charge item, the Chase employee checked that the account was current and that the charge would not surpass the limit on the account. The Chase employee noted on the account that a certain amount had been called in for advance authorization. When another merchant called in for an authorization on another purchase, the Chase clerk looked to the account to determine how many other charge authorizations were outstanding. In 1985, the advanced authorizations stayed on the account until the item was presented for payment or for 10 to 20 days after the billing date. After that time, Chased cleared the advanced authorizations from the customer's account.

Calhoun's account also provided for checks, which Chase handled differently from the account charges. Chase provided the customer with check drafts that look like personal bank checks. The drafts did not indicate the person presenting them to a merchant was actually paying for the item with credit. The checks did not require advance authorization. In fact, advance authorization would have destroyed the very purpose of the checks, which is to make the draft look like a personal check on a bank account instead of a purchase on credit.

On November 11, 1985, when Calhoun's $3,000 check was presented for the first time, Calhoun's account was overdue with a balance of $367.13. Because the account was overdue, Chase returned the check and sent Calhoun a notice that his remaining available credit could not accommodate the amount requested. This was before the double entry of the authorization for the airline tickets, which was made on November 15.

Calhoun first talked with Merritt about the bounced check on November 20. Merritt testified she did not recall talking with Calhoun. Because the double entry of the authorization for the airline tickets was on his account by that date, she told him that was the reason Chase bounced the check. Merritt was mistaken. The first time the check bounced it was because of the $367.13 overdue balance, not because of the double authorization for the airline tickets. Merritt denied that she told Calhoun she would call the Cadillac dealer and assure them the check would be processed if they resubmitted it. She said she did not have the authority to call a merchant or to pre-approve a check. She testified she never called merchants. She described her duties handling inquiries as a customer service representative.

When the check was presented the second time, Calhoun's account still showed the authorization for two sets of airline tickets at $1,350 each. Michael Kulesza, assistant treasurer and supervisor in the credit customer service area for Chase, explained that an account could be double-billed for an item if the merchant called in twice, or if two different merchants made an inquiry for the same tickets. Kulesza testified that Chase did not have the obligation or the resources to call each merchant who requested authorization to verify each request for authorization. Chase handles between 9 to 10 million active credit accounts. Kulesza testified that the double entry of the airline tickets would have been cleared automatically from Calhoun's account by December 17, after the next billing period.

Kulesza testified Chase had no record that Calhoun returned the credit card, or that he had written to Chase asking for a final bill and directing Chase to close his account. Kulesza testified that in his opinion nothing was done differently for Calhoun's account than any other account, that everything was handled according to bank procedures and policies. Kulesza testified Chase made several attempts to resolve the matter of Calhoun's credit problems by contacting the credit agencies. Once Chase contacted the agencies, it could not force them to correct their records.

Lopez testified he remembered a conversation with Calhoun. He said Calhoun was unhappy about the returned check. Lopez told Calhoun to put his complaint in writing and send it to Chase. Lopez testified he did not agree to deduct interest and credit the membership fee to Calhoun's account and he did not tell Calhoun to cut up his card. He testified he did not make any agreement with Calhoun and his department did not have the authority to give a customer credit. Lopez testified he never received anything from Calhoun.

## Qualified privilege

In point of error one, Calhoun contends the trial court erred in overruling his objections to submitting the instruction on qualified privilege because there was no evidence to justify such an instruction. Under this point, Calhoun claims the instruction was erroneous for two reasons: (1) there was no evidence Chase acted in good faith in communicating the information to the credit agencies; and (2) the instruction was incorrect because it instructed the jury that communicating facts to a credit reporting agency automatically conferred the qualified privilege.

At the charge conference, Calhoun objected to the court's instruction as follows.

Calhoun: Plaintiff objects to the instructions as to the qualified privilege. There was no evidence presented about the—the fact that the information was transmitted to another person having corresponding interest or duty.

Chase: Qualified duty is an essential part of libel, and it's an essential element for the defense; and, therefor, it's the Defendant's contention that it should be contained therein.

Calhoun: Well, our position is there's no evidence to support this defense.

The court overruled Calhoun's objection and submitted the following instruction following the question regarding libel:

You are instructed that when a communication is made in good faith on a subject matter in which the author of the communication has an interest or with reference to which he has a duty to perform, to another person having a corresponding interest or duty, that the communication, under such circumstances, is qualifiedly privileged. You are further instructed that any communications of alleged wrongful acts to an official authorized to protect the public from such acts is qualifiedly privileged. This means that such communications cannot be the basis of libel or slander or a claim for damages against a Defendant, unless said statements are false and made with malice. *You are instructed that as long as the Defendants only made the facts of the alleged account available to credit reporting agencies, then said communications were qualifiedly privileged. You are further instructed that the communications con-*

*tained in the credit report were qualifiedly privileged.*

You are further instructed that when a publication is qualifiedly privileged, the burden of proof is on the Plaintiff to show that said publications were false and made with malice. You are further instructed that there must be actual evidence of malice as that term is defined, and that malice cannot be inferred from the publication of the facts themselves, even if said facts are false.

(Emphasis added).

The only issue Calhoun preserved by his objection at the charge conference was his challenge to the sufficiency of the evidence to support the submission of the instruction. He did not preserve the issue whether the instruction was incorrect because it assumed that reporting facts to a credit reporting agency automatically conferred the qualified privilege.

■■■ When a credit agency provides information in good faith to a member who has requested information about the credit of a person, a qualified or conditional privilege exists. *Dun & Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 898 (Tex.1970). The same privilege extends to credit card companies who file credit reports with credit agencies. *Lomas Bank USA v. Flatow,* 880 S.W.2d 52, 53 (Tex.App.—San Antonio 1994, no writ). Once the conditional privilege is shown to exist, the burden is on the plaintiff to show that the privilege was lost by showing malice. *Dun & Bradstreet,* 456 S.W.2d at 898. The privilege justifies the communication when it is made without malice. *Id.* at 899.

■ Whether a certain type of communication has a qualified privilege is a question of law for the court. *Schauer v. Memorial Care Sys.,* 856 S.W.2d 437, 449 (Tex.App.—Houston [1st Dist.] 1993, no writ). If the plaintiff can show the defendant acted with malice, it destroys the privilege. *Casso v. Brand,* 776 S.W.2d 551, 561 (Tex.1989); *Dun & Bradstreet,* 456 S.W.2d at 898; *Free v. American Home Assurance Co.,* 902 S.W.2d 51, 55–56 (Tex.App.—Houston [1st Dist.] 1995, n.w.h.).

■ A communication loses its privileged status when it is made to those outside of the interest group in question *or* if it is made to those inside the interest group but is made with malice. *Perry Bros. Variety Stores, Inc. v. Layton,* 119 Tex. 130, 25 S.W.2d 310, 313 (1930) (if made outside the interest group); *Lomas Bank U.S.A.,* 880 S.W.2d at 54 (if made inside the interest group but with malice).

■ When the plaintiff alleges the defendant published a defamatory statement and the defendant raises the issue of qualified privilege, the plaintiff has the burden to prove the defendant made the statement to those outside the interest group or the defendant made the statement with malice. *Free,* 902 S.W.2d at 55–56 (show statement made with malice); *Reeves v. Western Co.,* 867 S.W.2d 385, 394 (Tex.App.—San Antonio 1993, no writ) (show statement made to those outside interest group).

Calhoun seems to make two arguments against the court's instruction on privilege—that Chase did not prove the credit agencies were within the group of persons to whom Chase had a qualified privilege to transfer information, and there was no evidence Chase acted in good faith in communicating the information to the credit agencies.

■ Calhoun did not present any evidence that the credit agencies were not privileged to receive the credit information from Chase. When a plaintiff contends a statement was made to persons outside the interest group, if the plaintiff consented to the communication of the statement to those persons, the action for libel is barred. *Reeves,* 867 S.W.2d at 394. The agreement that covered Calhoun's credit arrangement with Chase provided:

> **Credit reporting**.... You [Calhoun] agree that we [Chase] may exchange credit information about you with others in connection with your application, your Account, and any credit we extend to you.

By this provision in the agreement, Calhoun granted Chase permission to exchange information about his credit history with credit agencies. *Reeves,* 867 S.W.2d at 394. Thus, Calhoun cannot complain that Chase provid-

ed information about his credit to credit agencies.

■ When a plaintiff contends a statement was made with malice, if the statement has the status of qualified privilege, the law presumes good faith and want of malice. *Marathon Oil v. Salazar,* 682 S.W.2d 624, 630 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). To show malice, the plaintiff must prove the statement was made with knowledge that it was false, or with reckless disregard of whether it was true such that defendant entertained serious doubts as to the truth of the publication. *Carr v. Brasher,* 776 S.W.2d 567, 571 (Tex.1989). *Lomas Bank USA,* 880 S.W.2d at 54.

Calhoun did not present any evidence that Chase's communications to the credit agencies were actuated by malice. Because the law presumes good faith and want of malice where a party has a qualified privileged, and because Calhoun did not carry his burden to show malice, we hold Chase's privilege was intact. *Marathon Oil Co.,* 682 S.W.2d at 630. As such, Chase was entitled to have the jury instructed on the issue of qualified privilege.

We hold as a matter of law Chase had a conditional privilege to transfer information to credit reporting agencies. *Dun & Bradstreet,* 456 S.W.2d at 899. The trial court did not err in instructing the jury on the qualified privilege.

We overrule point of error one.

### Deceptive Trade Practices

In point of error two, Calhoun asserts the trial court erred (1) in failing to disregard the jury's answers to question number one, (2) in overruling his motion for judgment notwithstanding the verdict, (3) in rendering judgment for Chase against him based on the jury's answer to question number one, and (4) in overruling his motion for new trial, because (a) the evidence establishes as a matter of law the affirmative of question number one, and (b) the "no" answer to question number one is against the great weight and preponderance of the evidence.

Jury question number one reads:

Did Chase Manhattan Bank engage in any false, misleading, or deceptive act or practice that was a producing cause of damages to Randy Calhoun?

"Producing cause" means an efficient, exciting, or contributing cause that, in a natural sequence, produced the damages, if any. There may be more than one producing cause.

"False, misleading, or deceptive act or practice" means any of the following:

Represents that goods or services had or would have characteristics or benefits that they did not have; or,

Represents that an agreement confers or involves rights that it did not have or involve; or,

Misrepresenting the authority of a representative to negotiate the final terms of a consumer transaction.

The jury answered no to this question.

■ Calhoun had the burden of proof on this jury question. When an appellant challenges the trial court's action in overruling a motion to disregard an adverse jury finding on which the appellant had the burden of proof, the appellant must demonstrate the evidence conclusively establishes all vital facts in support of a favorable finding to that jury question. *Ritchey v. Crawford,* 734 S.W.2d 85, 86 (Tex.App.—Houston [1st Dist.] 1987, no writ). A trial court may only render a judgment contrary to the jury's findings if, as a matter of law, the evidence establishes the contrary to what the jury found. *Best v. Ryan Auto Group, Inc.,* 786 S.W.2d 670, 671 (Tex.1990). In reviewing a "no evidence" point of error, we must first examine the record for evidence supporting the finding and ignore all evidence to the contrary. *Responsive Terminal Sys., Inc. v. Boy Scouts of Am.,* 774 S.W.2d 666, 668 (Tex.1989); *Holley v. Watts,* 629 S.W.2d 694, 696 (Tex.1982). If no evidence supports the finding, only then do we look to see if the contrary finding is established as a matter of law. *Holley,* 629 S.W.2d at 696.

■ When an appellant challenges the factual sufficiency of the evidence to support an adverse finding, we must consider and weigh all the evidence, both in support of and contrary to the challenged finding. In re-

viewing the "great weight" points of error, we must uphold the finding unless we decide the finding is so against the great weight and preponderance of the evidence as to be manifestly erroneous or unjust. *Pool v. Ford Motor Co.,* 715 S.W.2d 629, 635 (Tex.1986): *In re King's Estate,* 150 Tex. 662, 244 S.W.2d 660, 661 (1951); *Pizzitola v. Galveston County,* 808 S.W.2d 244, 247 (Tex.App.—Houston [1st Dist.] 1991, no writ).

Calhoun argues the bank's authorization policy misled him to believe he had a credit line of $5,000, available immediately when, in reality, he only had a limit of $3,000 on cash advances and authorizations. Calhoun also claims that Chase led him to believe that if he returned the card, it would close his account and send him a final bill.

Calhoun admitted he did not read the credit agreement that Chase sent him. He contends he thought he could charge up to $5,000, and the bank did not make it clear to him there was a $3,000 limit on cash and any authorizations. Calhoun contends even if you add up the cost of the airline tickets as charged, $2,750, with the $3,000 check to the Cadillac dealer, he was still within the $5,000 credit limit.

Kulesza testified the bank reserves the right to give an authorization of a transaction when the purchase is above a certain amount or a cash advance is made. Kulesza testified when the merchant calls to request an authorization for a credit card, Chase or Visa makes a decision on whether to authorize the transaction. Kulesza testified the Chase credit card agreement specifies the total cash advances outstanding on the account may not exceed $3,000 or the amount available in the credit line, whichever is less. Kulesza testified Calhoun had an outstanding balance of $400 on November 11, and if the airline tickets and the check to Cadillac dealer are added, the amount was over the $5,000 credit limit.

 Under the legal insufficiency point of error, when we examine the record for favorable evidence and ignore all contrary evidence, we find ample evidence to support the jury's finding. *See Responsive Terminal,* 774 S.W.2d at 668. Calhoun's check to the Cadillac dealer was rejected the first time

because Calhoun's payment was received on November 11, instead of November 1. As to the issue regarding closing the account, the Chase employees testified Chase did not receive a written request from Calhoun to close the account and the account was ultimately closed because Calhoun refused to pay the $1,600 outstanding amount. Ultimately, Chase wrote-off the unpaid amount.

Under the factual insufficiency challenge, where we examine all the evidence, we do not find the evidence was against the great weight and preponderance of the jury's finding so as to be manifestly unjust. There was conflicting testimony whether Calhoun asked Chase in writing to close the account or whether Chase closed it when Calhoun refused to pay the outstanding amount due. The jury was entitled to believe Chase's version of the evidence.

We find there is ample evidence for a jury to find Chase did not engage in false, misleading, or deceptive acts. The credit agreement stated the cash advance limit was $3,000, and purchases above a certain amount would require Chase's advance approval. Calhoun had outstanding bills owed on the account that led to Chase's dishonor of his check.

We overrule point of error two.

### Prejudgment interest

In point of error three, Calhoun argues the trial court erred in denying him prejudgment interest on his damages. Calhoun contends he is entitled to prejudgment interest at the rate of 10 percent per year compounded daily or $41,847. The court denied Calhoun prejudgment interest because Calhoun did not segregate his damages that accrued at the time of the jury verdict from those that accrued post-verdict.

 Interest as damages is compensation allowed by law as additional damages for lost use of the money due as damages during the lapse of time between the accrual of the claim and the date of judgment. *Cavnar v. Quality Control Parking, Inc.,* 696 S.W.2d 549, 552 (Tex.1985). Prejudgment interest cannot be awarded on future dam-

ages and punitive damages. *Id.* at 555. A plaintiff is not entitled to recover prejudgment interest on damages until those damages have actually been sustained. *Id.* at 554. If the plaintiff does not segregate past losses from future losses he is not entitled to recover prejudgment interest on those elements of damages. *Clifton v. Southern Pac. Transp. Co.,* 709 S.W.2d 636, 641 (Tex.1986).

In response to Calhoun's point of error, the Bank claims Calhoun sought future damages in his pleadings, he offered some evidence that can be interpreted to support future damages, and thus Calhoun was not entitled to interest because he did not segregate the past damages from future damages. We disagree.

In Calhoun's third amended petition, Calhoun alleged that he would continue to suffer injury as a result of Chase's libel. He did not ask for future damages. At best, his pleadings can be interpreted as asking for damages beyond the date of the pleadings.[3]

Calhoun did not offer any evidence of future damages. The arguments of Calhoun in his opening statement and final argument were confined to requests that the jury reimburse him for damages already incurred. The jury charge did not ask the jury to find future damages.[4] Each fact Calhoun introduced or argument he made was limited in time up to the day of trial.

Calhoun did not try his case on the theory of post-trial damages and would not have been entitled to a future damage submission even if requested. We affirm the judgment, but reform it to add prejudgment interest of $41,783, the amount the parties agreed upon.[5]

We sustain point of error three.

---

3. In his pleadings Calhoun alleged as follows: Additionally, Plaintiff will continue to be exposed to financial injury because of the Defendant's libelous dissemination of information regarding Plaintiff's creditworthiness. Plaintiff therefore claims general damages in the sum of $1,250,000.00.

4. The only question on damages, jury question number 14, asked:
What sum of money, if any, now paid in cash would fairly and reasonably compensate Randy Calhoun for his damages proximately caused by Chase Manhattan Bank's wrongful dishonor of his check?
Consider the following elements of damages, if any, and none other:
Mental anguish.
Damages to credit reputation.
Reasonable and necessary expenses to redeem Randy Calhoun's dishonored check.
The reasonable value of the time spent by Randy Calhoun correcting or attempting to correct the problems with the dishonored checks.
Answer: $35,000

5. We find the prejudgment interest was not tolled because of the settlement offers. The tolling statute was not in effect at the time this case was filed. TEX.REV.CIV.STAT. art. 5069–1.05, § 6(c) (Vernon Supp.1995).