The GALVESTON COUNTY FAIR
& RODEO, INC., Appellant,

v.

Tom GLOVER, Jr. and Sandra Glover,
Individually and as Next Friend
of Eric Glover, Appellees.

No. 06–93–00047–CV.

Court of Appeals of Texas,
Texarkana.

Submitted March 16, 1994.

Decided May 24, 1994.

Rehearing Denied July 6, 1994.

Kenneth C. Kaye, League City, for appellant.

Thomas B. Greene, III, Ware, Snow, Fogel, Jackson & Green, Houston, for appellees.

Before CORNELIUS, C.J., and BLEIL and GRANT, JJ.

## OPINION

CORNELIUS, Chief Justice.

The Galveston County Fair & Rodeo, Inc. appeals from a judgment awarding Eric Glover and his parents, Tom Glover, Jr. and Sandra Glover, damages for libel, breach of contract, and tortious interference with contractual relations.

Eric Glover, age twelve, entered a steer in the 1992 Galveston County Fair. Eric was

assisted by his father and mother and his grandfather, Tom Glover, Sr. After being judged through three rounds of competition, the steer was declared by the steer judge, Charles Phillip, as best heavyweight exotic, champion exotic, and then grand champion for the entire fair. Phillip judged all three rounds, physically manipulating and handling the steer as part of the judging. He testified that he felt nothing unusual during the inspections, although he had earlier in the show felt some steers he thought had been "aired up" in violation of fair rules. Airing is the injection of air under the skin to create a more attractive appearance. Phillip stated that when he judged Eric's entry as grand champion, he slapped the steer. He testified that he thought, based on this slap, that air had been injected under its skin. He did not check or touch the steer again.

The judging took place on April 28, 1992. Phillip did not at that time disqualify the steer, nor did he immediately report his suspicions to any of the fair's staff. After the show, around 10:00 p.m., he reported his suspicions to Sonny Sewell, a member of the fair's board of directors and the market steer chairman. The next day, members of the board informally asked two veterinarians, Dr. Dennis Jenkins and Dr. Donald Cleary, to examine Eric's steer. Both veterinarians testified that they did not conduct what they considered a professional examination. Jenkins testified that he felt there was some gaseous matter under the skin of the steer's back, although his conclusions based on this finding were somewhat contradictory. Cleary stated that he did not believe the steer had been tampered with and suggested to fair officials that they retain a veterinarian to do a professional examination. Under the rules of the competition, the Fair had the right to employ a veterinarian and, if the veterinarian determined that the steer had been "unethically fitted" (aired, injected, or otherwise tampered with in violation of the rules), his determination would have been binding on all parties. The evidence indicates that the Fair did not follow that procedure.

The next evening, Del Papa Distributors made the high bid of $13,500.00 for Eric's steer at the auction for winning animals. Doreck & Sons subsequently killed and butchered the steer. John Doreck, Jr. testified that when he slapped the steer on the rump he thought the animal "sounded hollow" and that he noticed a large number of air bubbles in the carcass, but he also stated he could not say whether or not the steer had been aired.

Around May 15, 1992, fair officials notified Del Papa that there was a problem and, according to the testimony of Larry Hinze, president of the Fair's board, told Del Papa that it had the option to buy or not buy the steer. Del Papa never paid for the steer. On May 18, 1992, Hinze held a press conference and announced that certain steers were under investigation. At this time the Glovers had not been informed that Eric's steer was one of the steers under investigation.

The Fair's executive committee met on May 20, 1992. The committee voted to recommend to the board of directors that Eric Glover's steer be disqualified. Notice of the action was sent to the Glovers. On June 1, 1992, the board of directors met and voted to disqualify Eric's steer and another steer and to disqualify Eric from entering the 1993 fair. The Glovers had requested that they be allowed to attend the meeting, but the board refused. Instead, a written statement by the Glovers' attorney was read at the meeting. Although the Fair did not officially release the names of the Glovers, the print media had apparently been interested in the story, and several articles appeared before and after the Glovers were officially told of the disqualification.

Eric's parents, individually and as his next friends, sued the Fair, alleging breach of contract, conversion, tortious interference with contract, intentional infliction of emotional distress, libel, slander and defamation, negligence, gross negligence, and wrongful disqualification. At trial, the court granted a directed verdict for the Fair on the conversion and intentional infliction of emotional distress issues. The court then submitted the case to the jury on the theories of libel or slander, negligence, breach of contract, and tortious inference. The jury answered all questions in favor of the Glovers, who moved

for judgment on all theories submitted except for that of negligence. The court rendered judgment on the verdict, except for eliminating the recovery for negligence, disregarding the jury answers on which exemplary damages were based, and reducing the damages awarded to Eric for injury to reputation in the future from $40,000.00 to $10,000.00.

## JURY CHARGE

■ The Fair's initial complaint concerns Question No. 1 in the court's charge and the court's refusal to submit several related questions. Question No. 1 and its answer read:

> Did the Galveston County Fair & Rodeo wrongfully disqualify ERIC GLOVER'S steer from the 1992 Galveston County Fair & Rodeo?
> Answer "Yes" or "No".
> ANSWER: Yes

The Fair contends that the court should not have submitted Question No. 1, but should have submitted the following three questions it requested:

### Question A

Do you find from a preponderance of the evidence that the steer shown by ERIC GLOVER at the 1992 Galveston County Fair was unethically fitted?

You are instructed that a steer is unethically fitted if any method was used to alter the natural conformation of any part of the steer's body.

Answer "Yes" or "No".

### Question B

Do you find from a preponderance of the evidence that, in the opinion of the steer judge, Charlie Phillip, the steer shown by

ERIC GLOVER at the 1992 Galveston County Fair showed sights (sic) of having been operated upon or tampered with for the purpose of concealing faults in conformation or with intent to deceive relative to the animal's soundness?

Answer "Yes" or "No".

### Question C

Do you find from a preponderance of the evidence that a veterinarian concluded that the steer shown by ERIC GLOVER at the 1992 Galveston County Fair had been unethically fitted?

Answer "Yes" or "No".

Question No. 1 was a predicate to the questions involving libel, slander, and negligence. The jury was instructed to only answer the questions on libel and slander (Question No. 2) and negligence (Question No. 10), if it found, as asked by Question No. 1, that the Fair wrongfully disqualified Eric's steer.

■ Submission of questions to the jury is a matter within the discretion of the trial court. That discretion is limited, however, to asking questions that control the disposition of the case, that are raised by the pleadings and the evidence, and that properly submit the disputed issues. *Texas Employers Ins. Ass'n v. Alcantara*, 764 S.W.2d 865, 867 (Tex. App.–Texarkana 1989, no writ).

The Fair correctly argues that the question of wrongful disqualification is a controlling question and contends that the trial court erred in refusing to submit its requested questions. The Fair's three tendered questions all concern fact questions related to the Fair's governing rule concerning disqualification and whether the Fair wrongfully disqualified Eric's steer.[1]

1. Rule 16 of the "Market Steer Rules" under which the contest was held states:

 The showing of unethically fitted livestock or livestock of any ineligible age for exhibition in the class is prohibited. Unethical fitting will be deemed to consist of any method of altering the natural conformation of any part of the animal's body. Animals showing, in the opinion of the judge, sights (sic) of having been operated upon or tampered with for the pur-

 pose of concealing faults in conformation or with intent to deceive relative to the animal's soundness, will be disqualified. As a condition for participation in the Galveston County Steer Show, every exhibitor must agree to submit any animal so entered by him/her to inspection by a veterinarian and agrees that the conclusions reached by the veterinarian shall be final, without recourse against Galveston County Fair and Rodeo, Inc., or its representatives.

Fact questions need not be submitted separately and distinctly. *Alvarez v. Missouri–Kansas–Texas R.R. Co.*, 683 S.W.2d 375, 377 (Tex.1984). Indeed, except in extraordinary circumstances, a trial court should submit broad form questions. Tex. R.Civ.P. 277, 278; *Texas Dep't of Human Services v. E.B.*, 802 S.W.2d 647, 649 (Tex. 1990); *Island Recreational Dev. Corp. v. Republic of Texas Sav. Ass'n*, 710 S.W.2d 551, 555 (Tex.1986). Question No. 1 broadly submitted the issue of wrongful disqualification. The trial court did not abuse its discretion in refusing to submit the Fair's requested questions.

The Fair also complains that the trial court should have instructed the jury on what constitutes wrongful disqualification. The Fair, however, did not separately request in writing any definitions or instructions on this issue, as required by Tex. R.Civ.P. 273. Thus, no error is preserved. *Templeton v. Unigard Sec. Ins. Co.*, 550 S.W.2d 267, 269 (Tex.1976).

## SUFFICIENCY OF THE EVIDENCE

The Fair next contends that the evidence is legally and factually insufficient to support the jury's verdict. The jury found that (1) the steer was wrongfully disqualified; (2) the Fair libeled or slandered the Glovers; (3) the statements adversely affected Tom and Sandra Glover in their occupation, profession, trade or business; (4) the Fair breached its contract with Eric Glover; and (5) the Fair tortiously interfered with the contract between Eric Glover and the high bidder for his steer. Because the burden of proof was on the Glovers, the Fair's arguments will be styled as "no evidence" and "insufficient evidence" points. *See Croucher v. Croucher*, 660 S.W.2d 55, 58 (Tex.1983).

Galveston County Fair and Rodeo, Inc., reserves the right to have blood or urine laboratorial analysis made on any animal entered for competition. Galveston County Fair and Rodeo, Inc., also reserves the right to order the timely slaughter of any placing animal(s), and the evaluation of such carcass(es) after slaughter. If unethical fitting of livestock is determined, any and all sale monies will be withheld and participants may be barred from future participation at Galveston County Fair. An exhibitor of an animal producing an analy-

*Standard of Review*

When both no evidence and insufficient evidence points are raised, the court of appeals should rule upon the no evidence point first. *Glover v. Texas Gen. Indem. Co.*, 619 S.W.2d 400, 401 (Tex.1981). In reviewing a no evidence point, a court must consider the evidence and inferences in a light tending to support the finding and disregard all contrary evidence and inferences. *Weirich v. Weirich*, 833 S.W.2d 942, 945 (Tex. 1992). A no evidence point will only be sustained if there is a complete absence of, or no more than a scintilla of evidence to support the trial court's finding. *Freeman v. Texas Compensation Ins. Co.*, 603 S.W.2d 186, 191 (Tex.1980).

In reviewing a factual sufficiency challenge, we consider all the evidence in the record, including any evidence contrary to the judgment. *Plas–Tex, Inc. v. U.S. Steel Corp.*, 772 S.W.2d 442, 445 (Tex.1989). A factual sufficiency point will only be sustained if the evidence is so weak as to render the finding unjust. *See In re King's Estate*, 150 Tex. 662, 244 S.W.2d 660, 661 (1951). We may not substitute our judgment for that of the jury merely because we might have reached a different conclusion. *Westech Eng'g v. Clearwater Constructors, Inc.*, 835 S.W.2d 190, 196 (Tex.App.—Austin 1992, no writ). The jury is the judge of the credibility and weight of the witnesses and testimony and may choose to believe one witness and disbelieve others. *McGalliard v. Kuhlmann*, 722 S.W.2d 694, 697 (Tex.1986).

*Bases of Recovery*

At this point in the discussion, it is well to pause and take note of two critical matters: First, the Glovers' recovery in this case can-

sis with a quantity of diuretic or any unapproved medication will be barred from future competition at the Galveston County Fair and Rodeo, Inc. No change of the major color pattern of the animal by painting or dyeing will be allowed. Any grooming material that causes color to be removed from the steer will not be allowed. No grooming powders of graphite will be allowed on steers. Each steer will be checked at the entry gate and violators of this rule will be disqualified.

not be sustained on the basis of wrongful disqualification unless there is sufficient evidence that the Fair violated its own rules in disqualifying the steer. That is because the contest rules vest in the steer judge the absolute discretion to disqualify an animal by following specified procedures, and Eric agreed to those rules when he entered the contest. Second, the recovery cannot be sustained on the basis of libel or slander unless there is sufficient evidence that the statements of two fair officials were made with malice. That is because, as a matter of law, the statements were protected by a qualified privilege, and the privilege is lost only when the statements are made with malice.

*Wrongful Disqualification*

All parties agree that Rule 16 of the Fair's Market Steer Rules prohibits unethical fitting, including "airing." In addition, all parties agree that disqualification of a steer unethically fitted would be proper under this rule.

Charles Phillip, the steer judge, testified that he first became suspicious that the steer had been aired when he slapped the steer. Although he had closely examined the steer earlier, manipulating it and feeling it with his hands during three rounds of judging, he testified that he did not observe anything during these examinations to indicate that the steer had been aired. It was not until he heard the sound when he "slapped" the steer grand champion that he thought it had been aired. He described the sound as a hollow sound—like a bass drum. Several witnesses, however, including Eric Glover, Cheryl Johnson (a friend of the Glovers), and Sandra Glover, testified that they were present at the time, and that Phillip never slapped the steer, although it was customary for the judge to do so in such contests. In any event, Phillip did not further examine the animal, did not disqualify it, as he had the right to do under Rule 16, and did not report his suspicions to fair officials until later that night, after the show was over.

The Fair contends that Dr. Dennis Jenkins, one of two veterinarians the Fair asked to informally examine the animal, testified that in his opinion the steer had been unethically fitted. However, Jenkins' actual testimony on this issue was contradictory. He stated, both in his deposition and at trial, that he felt some gaseous material under the steer's skin, that he could not tell what the material was, and that he could not say how it got there. In his deposition he did indicate that he did not know of any source other than "airing" that would produce so much gaseous matter in a healthy animal, but he also stated "I can't say it was injected, no." At trial he opined that the gas did not get under the steer's skin by normal or natural means and, when told to answer "yes" or "no" as to whether, in his opinion, the steer had been aired or not, he answered "yes." On cross-examination, however, he agreed that he never reached a conclusion that the steer had been aired. Jenkins admitted, both in his deposition and at trial, that he had never seen or felt an "aired up" animal. He also testified that, had the steer been aired, he would have expected to see bruising and discoloration of the hide after the animal was slaughtered. John Doreck, Sr. and John Doreck, Jr., who slaughtered the steer, testified that they saw no discoloration or bruising of the hide. Dr. Asa Childers, a veterinarian and professor at Texas A & M University, called as an expert witness by the Glovers, also testified that there would have been bruising or discoloration of the carcass had the steer been aired. Childers testified that in his opinion, based on his review of the depositions of Charles Phillip, the Dorecks, and Dr. Jenkins, there was no evidence to indicate that the steer had been aired.

Dr. Donald Cleary, the other veterinarian who looked at the steer, gave his opinion that the steer had not been aired. As noted, neither Jenkins nor Cleary performed a professional examination. Cleary testified that he advised fair officials to employ a veterinarian to professionally examine the steer. The Fair did not do so.

The evidence further showed that the Fair did not begin an investigation until after the contest was over and the steer had been slaughtered. The investigation by fair officials was followed by first the executive committee meeting on May 20, 1992, at which time the committee voted to disqualify Eric Glover and the steer, and then the meeting of

the board of directors on June 1, 1992, at which time the board voted to disqualify Eric Glover and the steer. Phillip, Jenkins, Cleary, and the Dorecks did not attend either meeting.

There was testimony that, although John Doreck, Jr. and John Doreck, Sr., who slaughtered the steer, did not attend the meetings, it was reported to those attending the meetings that the Dorecks were of the opinion that the steer had been aired. The Dorecks testified at trial, however, that, although they observed an unusual amount of air bubbles in the carcass, they could not say what had caused the bubbles. In addition, both testified that they could not say that the steer had been aired. In addition, Dr. Asa Childers, the plaintiffs' expert witness, testified that bubbling in the carcass often occurs in the slaughtering process itself.

■ There is sufficient evidence from which the jury could have concluded that Eric's steer had not been aired. There is also sufficient evidence that the Fair violated its own rules and procedures for disqualifying an animal. The steer judge did not disqualify Eric's steer, and the Fair did not submit the steer to a veterinarian for a professional examination and final conclusion as to whether the steer had been unethically fitted, as required by Market Steer Rule 16.

We find the evidence both legally and factually sufficient to support the jury verdict that the Fair wrongfully disqualified Eric Glover's steer.

*Libel and Slander*

■ The Fair also contends that the evidence is legally and factually insufficient to support the jury's finding that the Fair libeled Eric and his parents. The Fair also contends that the evidence is legally and factually insufficient to support the jury's finding that such libel adversely affected Tom and Sandra Glover in their occupation, profession, trade, or business.

■ Actionable slander is a defamatory statement that is orally communicated or published with no legal excuse. *Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d 391, 396 (Tex.App.—Houston [1st Dist.] 1993, writ dism'd w.o.j.). As already discussed, the

jury was presented with sufficient evidence to determine that the Fair wrongfully disqualified the steer. The jury could have reasonably concluded that such a wrongful disqualification, given the alleged reasons for such disqualification, impeached the Glovers' honesty, integrity, virtue or reputation. *See* TEX.CIV.PRAC. & REM.CODE ANN. § 73.001 (Vernon 1986). Indeed, several of the Fair's own officials and witnesses conceded that such disqualification would cause anguish, mortification, and devastating embarrassment in the eyes of the community. The Fair's disqualification could reasonably be viewed by the jury as defamatory.

■ If a reasonable person would recognize that his act creates an unreasonable risk that the defamatory statements will be communicated to a third party, his conduct is negligent communication, which amounts to publication as much as an intentional communication. *First State Bank of Corpus Christi v. Ake*, 606 S.W.2d 696, 701 (Tex.Civ.App.—Corpus Christi 1980, writ ref'd n.r.e.) (quoting RESTATEMENT (SECOND) OF TORTS § 577, cmt. k (1977)); *see also Marshall Field Stores, Inc. v. Gardiner*, 859 S.W.2d at 396; *Chasewood Constr. Co. v. Rico*, 696 S.W.2d 439, 445–46 (Tex.App.—San Antonio 1985, writ ref'd n.r.e.). In addition, although the plaintiffs in a libel or slander action must be the particular persons about whom the allegedly defamatory statements are made, which normally means the plaintiffs must be named, *see Baubles & Beads v. Louis Vuitton, S.A.*, 766 S.W.2d 377, 381 (Tex.App.—Texarkana 1989, no writ), publication does not require that the plaintiff be named, if those who know the plaintiff and are acquainted with him understand that the defamatory publication referred to him. *Newspapers, Inc. v. Matthews*, 161 Tex. 284, 339 S.W.2d 890, 894 (1960); *Davis v. Davis*, 734 S.W.2d 707, 711 (Tex.App.—Houston [1st Dist.] 1987, writ ref'd n.r.e.).

A reasonable person on the executive committee or the board of directors would recognize that the act itself of disqualifying the grand champion steer of the Galveston County Fair and Rodeo would create a risk that such disqualification would be communicated

to third parties. Even if this were not the case, a reasonable person would recognize that if he held a press conference to announce that the Fair was investigating possible unethical fitting of two steers in the competition, as the evidence shows that Larry Hinze, president of the board of directors of the Fair did, that the subsequent disqualification would be communicated to third persons. The fact that the Glovers were not named is not dispositive; there was testimony from board members that anyone who knew anything about the fair knew that Eric Glover's steer was being investigated and was one of the steers disqualified. There was only one grand champion steer in the 1992 fair.

There was evidence submitted that the wrongful disqualification was well publicized—the record contains a number of excerpts from news articles detailing the Fair's investigation, the disqualification, and the Glovers' subsequent lawsuit. The Fair contends that it was the Glovers who first introduced their names into the news media by giving an interview with the *Houston Chronicle,* but this interview was given after the steer had been disqualified. The jury could have reasonably concluded that, because the Fair had previously announced to the press that it was investigating possible cheating concerning two of the winning steers, members of the general public and the news media would have been aware that Eric Glover was the owner of the grand champion steer disqualified by the Fair on June 1.

 The Fair correctly argues that the statements it made in connection with its investigation and disqualification of the steer were privileged. Moreover, the Fair's acts and statements were expressly authorized by the contest rules, to which Eric agreed by participating in the contest. Consequently, the statements cannot give rise to liability unless they were made with malice.

 There are two types of privilege in defamation cases—absolute and conditional. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762, 768 (Tex.1987) (*citing* RESTATEMENT (SECOND) OF TORTS §§ 583–612 (1977)). Absolute privilege applies only in a limited number of situations that involve the administration of the branches of government. *Hurlbut v. Gulf Atlantic Life Ins. Co.,* 749 S.W.2d 762. A qualified privilege protects persons who make statements in good faith on a subject matter in which the speaker has a common interest with the other person, or with reference to which the speaker has a duty to communicate to the other person. *Dun and Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896 (Tex.1970); *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197 (Tex.App.—Texarkana 1993, writ denied); *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612, 619 (Tex.App.—Corpus Christi 1992, writ denied). The jury was asked if the Fair's statements were privileged, and it found that they were not. Whether a privilege exists, however, is not a question of fact, but is a question of law for the court. *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612; *Houston v. Grocers Supply Co.,* 625 S.W.2d 798 (Tex.App.—Houston [14th Dist.] 1981, no writ). The Fair objected to the submission of this issue to the jury, and we find that, as a matter of law, the Fair's statements were subject to a qualified privilege.

 The qualified privilege is lost only when the defamatory material is published or communicated with actual malice. *Dixon v. Southwestern Bell Tel. Co.,* 607 S.W.2d 240 (Tex.1980); *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197. In response to a question submitted by the trial court, the jury found that the Fair made the defamatory statements with malice. The court defined malice as "ill will, bad or evil motive, or wanton disregard for the Plaintiffs' rights." In the context of a libel or slander claim, that definition of malice is incorrect. As to defamatory statements, malice is the making of the statements with knowledge that they are false, or with reckless disregard of whether they are false. *Dun and Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896; *Martin v. Southwestern Elec. Power Co.,* 860 S.W.2d 197. Neither the Fair nor the Glovers objected to the court's definition, however, nor did they request a correct definition. In that circumstance, they are bound by the court's definition, though incorrect.

The trial court disregarded the jury's answer that the Fair acted with malice. The court can disregard a jury finding only when there is no evidence supporting it. Tex.R.Civ.P. 301; *Carr v. Brasher,* 776 S.W.2d 567 (Tex.1989). We agree with the trial court that there is no evidence that the Fair acted with malice, even according to the incorrect definition. The Fair may have been negligent, may have treated Eric Glover unfairly under the circumstances, may have conducted a faulty investigation, may have been wrong in its belief that the steer had been aired, but none of those is evidence of malice. Negligence, failure to investigate, or failure to act as a reasonably prudent person are legally insufficient in themselves to support a finding of malice. *El Paso Times, Inc. v. Trexler,* 447 S.W.2d 403 (Tex. 1969).

One witness, Edith Bishop, a member of the Fair's executive committee, testified that she had a personal bias against Eric's grandfather, who was not a party to the suit, because she had heard rumors that he had cheated in another contest. She said, however, that she did not communicate that personal feeling to the fair officials and that she scrupulously avoided transferring that feeling to Eric or his parents. Indeed, she said that her personal knowledge of rumors about Eric's grandfather caused her to be even more careful to be fair and scrupulous in her investigation of Eric's disqualification, because she did not want to prejudge him because of what she had heard about his grandfather. There is no evidence contradicting or impugning her testimony. Even if she had a prejudice against the grandfather, it did not affect her actions in this matter, and there is no evidence that the Fair acted on it or was influenced by it in any way. All the evidence shows that the fair officials acted in the good faith, sincere belief that Eric's steer should be disqualified.

As there is no evidence that the Fair acted with malice, its statements were privileged and cannot subject it to liability for slander or libel. Nor can the jury's finding of exemplary damages be sustained. The trial court correctly disregarded those jury findings.

The jury also found, in response to Question No. 9 in the court's charge, that the Fair's libel or slander affected the occupation, trade, business, or profession of Tom and Sandra Glover. In view of our disposition of the libel and slander issue, it is not necessary for us to discuss this issue.

*Breach of Contract*

The Fair further argues that the evidence is legally and factually insufficient to support the jury's finding that the Fair breached its contract with Eric Glover. The Fair does not dispute that a contract was formed between it and Eric. In order to be entitled to the rewards of the contest (offer) it was necessary for Eric to accept the offer by performing all obligations of the offer. *First Texas Sav. Ass'n v. Jergins,* 705 S.W.2d 390, 391 (Tex.App.—Fort Worth 1986, no writ). Under the terms of the contract, if Eric complied with the rules and his steer was judged grand champion, he was entitled to receive the proceeds of the winning bid at the auction. The parties stipulated that if the jury found that the Fair failed to comply with the contract, damages would be the bid amount of $13,500.00 less the Fair's eight percent commission.

The Fair's only argument under this point is that, under the rules of the contest which constituted the terms of the contract, the steer was properly disqualified and, therefore, the Fair did not breach the contract by such disqualification.

We have already found that there is sufficient evidence to support a conclusion that the steer was wrongfully disqualified and that the Fair violated its own rules—and thus the contract—in making the disqualification.

*Tortious Interference*

The Fair also argues that the evidence is both legally and factually insufficient to support the jury's finding that the Fair tortiously interfered with Eric Glover's contractual relations with the buyer of the steer. The Fair further argues that, in any event, even if it did interfere with the contract, its statements were privileged and justified.

There is sufficient evidence to show that Eric had a contract with Del Papa, the

high bidder for the steer, and that the Fair's notice to Del Papa that it did not have to pay for the steer interfered in that contract. The only act of interference alleged, however, is the Fair's statement to Del Papa that it did not have to pay for the steer because it was improperly fitted. As noted earlier in this opinion the Fair's statements were subject to a qualified privilege. Moreover, one is privileged to interfere with another's contractual relations if it is done as a bona fide exercise of his own rights, or if he has equal or superior rights in the subject matter to those of the other party. *Victoria Bank & Trust Co. v. Brady,* 811 S.W.2d 931 (Tex.1991); *Black Lake Pipe Line Co. v. Union Constr. Co.,* 538 S.W.2d 80 (Tex.1976); *Martinez v. Hardy,* 864 S.W.2d 767 (Tex.App.—Houston [14th Dist.] 1993, no writ). Eric's right to be paid the auction price for the winning steer was a part of his contract with the Fair and an obligation of the Fair in that contract. Consequently, in addition to its qualified privilege as to the defamatory statements, the Fair's acts in interfering in Eric's contract with Del Papa were privileged. Liability could not attach unless those acts were committed with malice. As noted earlier, there is no evidence that they were done with malice. Therefore, a recovery of damages for tortious interference with the Del Papa contract cannot be sustained.

### DAMAGES

Finally, the Fair argues that there was no evidence—raising only a legal sufficiency claim—to support the jury's award of damages to the Glovers for injury to reputation and character and for mental suffering or anguish, humiliation, and embarrassment arising from the libel and slander.

We find there is sufficient evidence to support the amounts of damage, but as noted earlier, damages cannot be recovered for the allegedly libelous and slanderous statements because they were privileged, and there is no evidence they were made with malice.

### CROSS–POINTS

The Glovers bring three cross-points of error on appeal. In their first, they argue that the trial court erred in sua sponte reducing the jury award to Eric Glover for injury to reputation in the future from $40,000.00 to $10,000.00.

Although the trial court styled its reduction as a remittitur, the court's action will not be considered as such. When a trial court (or an appellate court) finds that there is no evidence to support an award of actual damages, it should enter a take-nothing judgment for that amount without suggesting a remittitur. *Larson v. Cactus Util. Co.,* 730 S.W.2d 640, 641 (Tex.1987). Should the court find, however, that the evidence is factually insufficient, it should *"suggest* a remittitur of that part of the verdict." *Id.* (emphasis added). The trial court may deny the defendant's motion for new trial on the condition that the plaintiff remit the suggested amount. 5 MCDONALD TEXAS CIVIL PRACTICE § 28:44[a] (rev.1992). It appears clear, however, that a trial court may not order a remittitur; a remittitur may only be suggested, not compelled. *Highlands Ins. Co. v. Baugh,* 605 S.W.2d 314, 319 (Tex.Civ.App.—Eastland 1980, no writ); *see also Benavidez v. Isles Constr. Co.,* 716 S.W.2d 588, 589 (Tex.App.—Corpus Christi 1986), *rev'd on other grounds,* 726 S.W.2d 23 (Tex.1987); W. Wendell Hall, *Revisiting Standards of Review in Civil Appeals,* 24 ST. MARY'S L.J. 1045, 1121 n. 531 (1993); William Powers, Jr. & Jack Ratliff, *Another Look at "No Evidence" and "Insufficient Evidence",* 69 TEX. L.REV. 515, 564 (1991).

In this case, the trial court ordered a reduction of damages and did not condition such on the overruling of a motion for new trial. The effect of its action is that of overturning the jury's verdict and is not a remittitur. *Benavidez v. Isles Constr. Co.,* 716 S.W.2d at 589. The trial court's ruling is tantamount to granting a judgment notwithstanding the verdict or to disregarding jury answers to special issues and, as such, should be upheld on appeal only if there was no evidence to support the jury's finding. *Id.* at 590.

Nevertheless, since we have held that Eric cannot recover any damages for libel or slander, the court's error in this regard is immaterial.

In their other cross-points the Glovers complain that the trial court erred when, upon motion of the Fair, it disregarded the jury answers to Questions No. 7 and 18, upon which exemplary damages were based. Under Question No. 7, which was predicated upon a finding of libel or slander, the jury affirmatively answered that the Fair had made the libelous or slanderous remarks with malice. Having answered Question No. 7 affirmatively, the jury then (in Question No. 8) awarded exemplary damages of $2,500.00 to each plaintiff. Question No. 18, which was predicated on a jury finding of tortious interference by the Fair with the contractual relations between Eric Glover and the buyer of the steer, asked the jury whether such interference was "actuated by ill will, spite, evil motive, or wanton disregard for Eric Glover's rights." Having answered affirmatively, the jury then (Question No. 19) awarded $25,000.00 exemplary damages to Eric Glover. The court's judgment, which disregarded the jury's answers to Questions No. 7 and 18, did not, of course, include the amounts awarded as exemplary damages.

We have already found that there is no evidence of malice. Consequently, the trial court correctly disregarded the answers to Questions No. 7 and 18.

For the reasons stated, the judgment is modified to delete the recovery of all damages arising from libel and slander and tortious interference with contractual relations. The judgment, as modified and as it awards recovery to the Glovers for breach of contract and attorney's fees, is affirmed.