**EAST TEXAS MEDICAL CENTER CANCER INSTITUTE,
Appellant,**

v.

**Mitchell ANDERSON, M.D., Appellee.**

No. 12–97–00302–CV.

Court of Appeals of Texas,
Tyler.

Sept. 30, 1998.

Rehearing Overruled Dec. 15, 1998.

Robert B. Gilbreath, Dallas, for appellant.

Deborah J. Race, Tyler, for appellee.

Before RAMEY, C.J., and HOLCOMB and HADDEN, JJ.

HADDEN, Justice.

East Texas Medical Center Cancer Institute ("the Institute") appeals from a

judgment based on a jury verdict awarding Mitchell Anderson, M.D. ("Anderson") damages for alleged slander and breach of contract. The Institute brings three issues on appeal. We will reverse and render.

## BACKGROUND

Prior to August 29, 1996, the Institute, a private outpatient cancer treatment facility in Tyler, Texas, operated under an open medical staff arrangement. Under that arrangement, any medical doctor could obtain and maintain privileges to practice at the Institute. Anderson and other medical doctors were on the staff of the Institute. Beginning in 1992, the board of directors of the Institute began discussing a change in its organizational structure. Based upon recommendations by outside consultants, the Institute eventually negotiated an exclusive contract with a board certified oncologist, James Kolker, M.D. ("Kolker"). Under the new structure, Kolker would select the doctors who would make up the Institute's medical staff. Only those doctors who contracted with Kolker would be allowed to practice at the Institute. This was described as an exclusive contract or closed staff arrangement. Thus, if Anderson or any other member of the medical staff was not under contract with Kolker on the effective date of the new arrangement, he would no longer be on the medical staff of the Institute.

At trial, the evidence showed that as early as 1993, Anderson knew of the proposed changes, and that in 1995, Anderson knew that the Institute was looking for a director with qualifications that he did not have. However, the consultants recommended that Kolker offer Anderson a staff position under the new arrangement, and Kolker agreed. In the spring and summer of 1996, Kolker began negotiating with Anderson to enable him to remain with the Institute under the closed staff structure. In May or early June of 1996, Kolker discussed the contract terms with Anderson, and Anderson led Kolker to believe that he would probably remain with the Institute by signing the contract with Kolker. During these negotiations, Kolker and Anderson were being counseled by their respective attorneys.

At the Institute board of director's meeting held on Monday, August 26, 1996, attended by Anderson, the board approved the exclusive contract between the Institute and Kolker, which provided for the new closed staffing plan. The resolution provided that the new plan would take effect at 5:00 p.m. on Thursday, August 29, 1996. After the board adopted the resolution on Monday, August 26, Kolker had the following conversation with Anderson:

. . .

> . . . Dr. Anderson, you were there at the board resolution. The deadline is Thursday at 5:00 o'clock. Are we done negotiating? Are you going to sign the contracts?
> And he said, "Well, what happens if I don't?" And I said, "Well, that's the date of the deadline. That's the date that the board said that if you're not working for ETRO, you're not working here."

. . .

Tom Jortner ("Jortner"), the chief administrator of the Institute, testified that he wanted Anderson to be a part of the new staff and that he expressed that to him on numerous occasions. On the morning of August 29, Jortner reminded Anderson of the upcoming change and asked if he was going to sign the new contract. Kolker testified that, at 4:30 that day, Anderson stated that he would sign the contract. However, at 6:30 p.m., Anderson called Jortner and said that he had decided not to sign. Because the new contract went into effect at 5:00 p.m. that day, Jortner believed that, as of that time, Anderson was not a contracted physician, and therefore, no longer had staff privileges at the Institute.

It was also apparent to Kolker and Jortner that Anderson had not informed his

patients of the change and that they would need to tell Anderson's patients who would be coming in the next morning, Friday, August 30, that Anderson was no longer on staff and would not be there. Jortner wrote a letter and delivered it to Anderson on the evening of August 29. In that letter, Jortner expressed his concern for Anderson's patients and the continuity of their patient care. In conversations that evening and the next morning with Kolker or Jortner, Anderson told them to continue the prescribed patient treatments and to give his patients his telephone number. He also stated to Jortner that he was trying to make arrangements for his patients to receive their treatments at another oncology center. Kolker, Jortner, and the Institute's attorney met that evening to discuss what to tell Anderson's patients. The original suggestion was to tell Anderson's patients that he had lost his staff privileges. However, they decided not to tell the patients that because of the inevitable conclusion that, in the mind of the average patient, Anderson may have done something wrong. They finally agreed in order to protect his reputation and avoid unduly alarming patients that the best thing to tell Anderson's patients was that Anderson had "effectively resigned."

The next day, August 29, several of Anderson's patients appeared for treatment as expected. The Institute failed to timely instruct its staff on how to communicate Anderson's status to his patients, and Institute employees told some of the early arriving patients that Anderson "resigned," rather than "effectively resigned." Nelda Davis, a cancer patient, was taken to the Institute by her cousin, Betty Ivy, for her scheduled treatment. Davis testified that a nurse told her that Anderson had resigned and that she would be seeing another doctor. Ivy testified that Kolker told her that Anderson had resigned as of last evening. Frances Chapman testified that when she arrived at the Institute for her treatment, Kolker told her that Anderson had resigned and that her treatments would continue as they had in the past. Josleen Corbin testified that when she went for her treatment on that Friday, a nurse told her that Anderson would no longer be there but that she should continue her treatments. However, the nurse did not use the word "resign."

Jortner and Anderson also disagreed about the ownership of Anderson's patients' records. In their conversation the night of August 29, Anderson told Kolker that he was going to come get the records. To ensure that Anderson did not remove the records, Kolker told the Institute's security guard to request that Anderson turn in his keys to the building. The next day, August 30, Anderson went to the facility, but was not allowed in.

In his suit, Anderson alleged causes of action based on slander per se, breach of contract, and tortious interference with contract.[1] To Anderson's slander claim, the Institute asserted the affirmative defense of qualified privilege. The jury found that the Institute's statements to Anderson's patients that he had "resigned" or "effectively resigned" were slander that was calculated to injure Anderson's business profession or occupation; that the Institute's statements to Anderson's patients that he had resigned or effectively resigned were not substantially true, but that the statements made by the Institute were not made with malice. The jury further found that the Institute had agreed that Anderson could treat his patients at the Institute until his staff privileges were terminated by the Institute for cause after a fundamentally fair hearing and that the Institute failed to comply with this agreement. The jury awarded Anderson $415,000.00 in damages for slander and $30,000.00 in damages for breach of contract.

1. The jury found that the Institute did not tortiously interfere with Anderson's professional relationship with his patients or referring physicians, and neither party assigns error with regard to this cause of action.

The trial court overruled the Institute's Motion for Judgment Notwithstanding the Verdict wherein it asserted, *inter alia,* that the statements were privileged and rendered judgment in favor of Anderson in accordance with the jury verdict.

■ In its first issue presented, the Institute asserts that it was not slander per se for its representative to state that Anderson had resigned from the Institute. Alternatively, the Institute contends that it had a qualified privilege to tell patients about Anderson's status with the Institute, and that the statement was an accurate abridged version of the facts. Because we hold that the Institute had a qualified privilege to tell Anderson's patients why he was not at the Institute, it will not be necessary for us to determine whether the statements were slander per se nor will it be necessary for us to address the affirmative defense of substantial truth.

### ANDERSON'S SLANDER CLAIM

■ Slander is a defamatory statement that is orally communicated to a third person without legal excuse. *Randall's Food Markets, Inc. v. Johnson,* 891 S.W.2d 640, 646 (Tex.1995). Legal excuse includes the defense of qualified privilege. *Hanssen v. Our Redeemer Lutheran Church,* 938 S.W.2d 85, 92 (Tex. App.—Dallas 1996, writ denied). A condition or qualified privilege applies to communications made in good faith on any subject matter in which the author has an interest or with reference to which he has a duty to perform to another person having a corresponding interest or duty. *Galveston County Fair & Rodeo, Inc. v. Glover,* 880 S.W.2d 112, 120 (Tex.App.—Texarkana 1994, writ denied); *Mitre v. Brooks Fashion Stores, Inc.,* 840 S.W.2d 612, 619 (Tex.App.—Corpus Christi 1992, writ denied).[2] Whether a conditional or

qualified privilege exists is a question of law for the court. *Houston v. Grocers Supply Co.,* 625 S.W.2d 798, 800 (Tex. App.—Houston [14th Dist.] 1981, no writ). Where an action is based on a conditionally or qualifiedly privileged communication or statement, the plaintiff must prove that the defendant's statements were actuated, inspired, or colored by actual or express malice, existing at the time of publication or by some evil motive or bad faith. *Gray v. HEB Food Store # 4,* 941 S.W.2d 327, 330 (Tex.App.—Corpus Christi 1997, writ denied); *Goree v. Carnes,* 625 S.W.2d 380, 384 (Tex.App.—San Antonio 1981, no writ). When the statement is made without malice, the effect of the privilege is to justify the communication. *Dun and Bradstreet, Inc. v. O'Neil,* 456 S.W.2d 896, 899 (Tex.1970); *Gillum v. Republic Health Corp.,* 778 S.W.2d 558, 572 (Tex.App.—Dallas 1989, no writ). *See Hanssen,* 938 S.W.2d at 92.

■ In the instant case, the jury returned a finding that the Institute did not act with malice. Anderson, however, contends that the jury's findings of slander per se and that the statements were not substantially true constituted the equivalent of a finding of a lack of good faith. We disagree. There was no finding of evil motive or bad faith or malice by the jury. Furthermore, the inquiry regarding actual malice embraces a higher level of culpability than mere ill will or animosity. Negligence, failure to investigate the truth or falsity of the statements prior to publication, and failure to act as a reasonable prudent person are insufficient to support a finding of malice. *Shearson Lehman Hutton, Inc. v. Tucker,* 806 S.W.2d 914, 921–22 (Tex.App.—Corpus Christi 1991, writ dism'd w.o.j.); *Marathon Oil Co. v. Salazar,* 682 S.W.2d 624, 631 (Tex.App.—Houston [1st Dist.] 1984, writ ref'd n.r.e.). While we recognize that the privilege may

**2.** The Texas Supreme Court implicitly overruled this case, along with *Reeves v. Western Co. of North America,* 867 S.W.2d 385 (Tex. App.—San Antonio 1993, writ denied), in *Cain v. Hearst,* 878 S.W.2d 577 (Tex.1994).

However, the *Cain* opinion overruled *Mitre* and *Reeves* by holding there is no cause of action for the false light invasion of privacy tort. *Cain* does not address the slander holding in these cases.

be abused, in the absence of such abuse and in the absence of malice, the defense of conditional or qualified privilege may extend even to a communication that is false. *Reeves v. Western Co. of N. America*, 867 S.W.2d 385, 394 (Tex.App.—San Antonio 1993, writ denied);[3] *Goree*, 625 S.W.2d at 385.

Anderson was present at earlier board meetings when the new proposal was discussed and he knew that his staff privileges at the Institute would soon end. Then, on Monday, August 26, 1996, the board set a deadline for the transition to be effective at 5:00 p.m. on Thursday, August 29, 1996. Anderson was also present at that last board meeting. Kolker had offered Anderson staff privileges under the new contract, which Anderson reviewed with his attorney. As the deadline drew near, Institute personnel inquired of Anderson if he was going to sign the contract.

Anderson acknowledged that he was aware of the deadline and that the existing staff, which included him, would be abolished. He further acknowledged that, as late as 4:30 p.m. before the 5:00 o'clock deadline, he had every intention of signing the contract. However, after consulting with his attorney again, Anderson called the Institute and stated that he was not going to sign the contract. When the deadline arrived, Anderson had made no arrangements to treat his patients elsewhere nor had he informed his patients of the Institute's medical staffing changes.

▮ After the deadline on the evening of August 29, Jortner reminded Anderson in writing that the new arrangement was in effect and that he no longer had privileges at the Institute. In his letter, Jortner also expressed concern regarding the continuity of patients' care and requested that Anderson "[l]et me know when we can visit with you as to the continuity of care issue." Anderson told Jortner the next morning that he was making arrangements

to have his patients treated at another cancer treatment facility in Tyler, but those arrangements had not yet been made. Thus, the Institute was faced with patients coming to the facility for scheduled treatment under the supervision of a doctor who no longer had staff privileges. The Institute, therefore, had an interest in explaining Anderson's absence to his patients. Likewise, the cancer patients, who were coming to the facility for treatment, had a corresponding interest in learning the same information about their doctor. *See Galveston County Fair & Rodeo, Inc.*, 880 S.W.2d at 120. Thus, we conclude as a matter of law that the Institute had a conditional privilege to make the statements which it made to Anderson's patients even if the statements were not perfectly accurate. *See Reeves*, 867 S.W.2d at 394. That conditional privilege could only be lost if the jury had found malice.

We, therefore, sustain the Institute's issue number one and hold that the trial court erred in refusing to grant the Institute's Motion for Judgment Notwithstanding the Verdict on the issue of privilege. In view of this holding, it will not be necessary for us to address the Institute's second issue regarding damages.

### ANDERSON'S CONTRACT CLAIM

In its third issue, the Institute complains that there was neither legally nor factually sufficient evidence of any "agreement" regarding the use of the cancer institute facilities by Anderson. Anderson's contract claim was premised on the alleged failure of the Institute to allow Anderson to treat his patients until such time as his staff privileges were terminated by the Institute for cause after a fundamentally fair hearing. He alleges that by revoking his privileges without procedural due process, the Institute breached this agreement. The jury agreed and found that an agreement existed and that the Institute

3. See note 2.

failed to comply with that agreement. However, the Institute asserts that even if an agreement existed, the evidence was legally and factually insufficient to support the jury's finding that the Institute breached the agreement. It contends that the Institute's decision to change from an open staff structure to an exclusive contract did not constitute a breach of that agreement.

In reviewing a "no evidence" point, an appellate court must consider only the evidence and reasonable inferences that tend to support the jury's findings while disregarding all evidence and inferences to the contrary. *Davis v. City of San Antonio*, 752 S.W.2d 518, 522 (Tex. 1988). The court may reverse and render only if no more than a scintilla of evidence supports the verdict. *Garza v. Alviar*, 395 S.W.2d 821, 823 (Tex.1965). When conducting a factual sufficiency review, the reviewing court must examine all of the evidence. *Ortiz v. Jones*, 917 S.W.2d 770, 772 (Tex.1996). If the jury's finding is so against the great weight and preponderance of the evidence as to be clearly wrong and manifestly unjust, this court should set aside that finding. *Cain v. Bain*, 709 S.W.2d 175, 176 (Tex.1986).

A claim for breach of contract requires proof that (1) a binding contract existed; (2) defendants breached the contract; and (3) plaintiffs suffered damages caused by the defendants' alleged breach. *Ryan v. Superior Oil Co.*, 813 S.W.2d 594, 596 (Tex.App.—Houston [14th Dist.] 1991, writ denied); *see, e.g., Stegman v. Chavers*, 704 S.W.2d 793, 795 (Tex.App.—Dallas 1985, no writ). Procedural rights created in a medical organization's by-laws may constitute contractual rights in favor of a doctor with staff privileges. *Gonzalez v. San Jacinto Methodist Hospital*, 880 S.W.2d 436, 439 (Tex.App.—Texarkana 1994, writ denied). *See also Pepple v. Parkview Memorial Hospital, Inc.*, 536 N.E.2d 274, 276 (Ind.1989); *Ray v. St. John's Health Care Corp.*, 582 N.E.2d 464 (Ind.App.1991); *Stiller v. La Porte Hospital, Inc.*, 570 N.E.2d 99, 103 (Ind.App. 1991); Bruce I. McDaniel, Annotation, *Validity and Construction of Contract Between Hospital and Physician Providing for Exclusive Medical Services*, 74 ALR3d 1268 (1976).

Anderson asserts that the by-laws of the medical staff of the Institute ("Staff by-laws") and the by-laws of the Institute itself ("Institute by-laws"), when taken together, provided a basis for a binding agreement between the Institute and the members of the medical staff of the Institute, which included Anderson. Anderson argues that the two sets of by-laws constituted a contract because they provided a framework by which the Institute had bound itself to operate with a medical staff and because he operated under those by-laws for twelve years in order to maintain his Institute privileges. We agree.

We will discuss some of the more salient aspects of both sets of by-laws. Among the Institute's purposes was the furnishing of medical services and medical procedures for the care of persons suffering from cancer and related illnesses. To accomplish these purposes, the Institute by-laws provided for a medical staff of doctors and granted to the medical staff the organization, composition, and delegation of authority as are set forth in the Staff by-laws, subject to approval by the directors of the Institute.

In the preamble to the Staff by-laws, the medical staff recognizes that it is responsible to the Institute for the quality of medical care at its facility and that it must accept and discharge this responsibility which has been assigned to it. The medical staff further acknowledges that the cooperative effort of the medical staff, the administrator, and the governing body of the Institute are necessary to fulfill the Institute's obligations to its patients. These by-laws were approved by the Institute. As an apparent part of the consideration for the use of the Institute's facilities,

the medical staff has agreed in its by-laws to insure quality medical care, to provide a means of resolving medical-administrative problems, to supervise enforcement of the Institute's rules and regulations, to provide programs of continuing education and to insure that each member of the medical staff observes all ethical principles of the profession. In connection with the Institute's requirements that the medical staff be responsible for the quality of medical care at the Institute, the medical staff has agreed to investigate and evaluate credentials of applicants for staff privileges and the quality of medical care rendered at the Institute and to report the findings periodically to the Institute board of directors.

From the evidence, it appears that the Institute and Staff by-laws combined to afford Anderson certain contractual due process rights. The Staff by-laws provide a procedure for monitoring and correcting the performance of the medical staff. Whenever the professional conduct of a doctor on the medical staff and his use of clinical skills is considered to be lower than the standards or aims of the medical staff or is deemed to be disruptive to the operations of the Institute, corrective action against the doctor may be requested by a member of the medical staff, by the administrator of the Institute, or the governing board of the Institute. Then follows a detailed procedure which affords due process for that doctor. Thus, we hold that there was legally and factually sufficient evidence to support the jury's finding that the Institute and Staff by-laws afforded Anderson contractual rights to due process.

The Institute contends, however, that even if there was a contract, Anderson's contractual claim must fail for two reasons. First, there is no evidence that the Institute breached the contract. Second, the Institute maintains that Anderson failed to comply with certain procedural prerequisites to asserting a claim against the Institute. We agree.

The contract rights to due process afforded Anderson under the Institute's by-laws were for the purpose of maintaining competency in professional conduct and practice by its medical staff doctors. Anderson's competence and ethical conduct were never an issue in this case. The Institute conducted a major administrative revision of its organization, abolished the medical staff arrangement, and entered into an exclusive contract with Kolker. The context of the by-laws' procedural due process requirements indicates that these procedures do not involve matters of administrative decisions, but rather deal with matters of professional competence and ethical conduct. The context clearly shows that it is the staff doctors' conduct and qualifications that are under review, not the Institute's. These procedures were not intended to cover cases in which a doctor's staff privileges have been affected by some administrative decision not directly involving Anderson. *See Gonzalez*, 880 S.W.2d at 440. While in the present case, the exclusive contract with Kolker may have the effect of eliminating Anderson's staff privileges at the Institute, this action by the Institute was not a challenge to his professional conduct nor an effort to remove Anderson for cause. Moreover, Anderson was offered the opportunity to remain on staff under the new arrangement. Thus, Anderson was not entitled to a hearing because the underlying rationale for a hearing was not present. In other words, there is nothing to be considered at a hearing in this situation. The purpose of such a hearing could not be to override administrative decisions regarding the operation of the Institute. *Id.*

▮ Secondly, the Institute asserts that Anderson failed to comply with procedures set forth in the by-laws. Jortner gave Anderson written notice on August 29, 1996, that effective 5:00 p.m. on that day, he would no longer have privileges at the Institute because of the new exclusive contract arrangement with Kolker. If Anderson believed that such action in-

voked the provisions entitling him to a hearing, the Staff by-laws required that he present to the Institute administrator a written notice of his desire for an appeal and a hearing. His failure to make such a request within ten days was a waiver of the right to such hearing. The record does not include any written request from Anderson made within ten days. Thus, it appears that under the terms of the by-laws, Anderson waived his right to a hearing.

 Anderson also asserts that, by statute, the Institute was mandated to provide due process to a physician in affording a physician staff privileges. Section 241.101(c) of the Texas Health and Safety Code provides in part: "[T]he process for considering applications for medical staff membership and privileges must afford each physician, ... procedural due process." TEX. HEALTH & SAFETY CODE ANN. § 241.101(c) (Vernon Supp.1998). However, this section is only applicable to hospitals, that is, those facilities that provide beds for use for more than twenty-four hours. TEX. HEALTH & SAFETY CODE ANN. § 241.003(3), (5), (14) (Vernon Supp.1998).

The due process rights created by the Health and Safety Code do not apply to Anderson's situation. First, the undisputed evidence in this case establishes that the Institute is not a hospital within the meaning of the statute, and thus, the finding of the jury that the Institute was a hospital is unsupported by the evidence. Second, even if it were a "hospital" as defined by the statute, the statute only applies when the hospital is considering "applications for medical staff membership and privileges." As discussed above, this case involves the abolition of a medical staff under a reorganization plan of the Institute and does not involve the consideration of an application for medical staff membership and privileges. In his testimony, Anderson agreed that he was not claiming that any of his rights to due process were violated while making an application for staff privileges or member-

ship. Thus, we conclude that Anderson's contention that the statute is applicable to the Institute herein is without merit.

We thus hold that, although an agreement affording due process rights existed between Anderson and the Institute, there was no evidence that the Institute breached that contract or that Anderson complied with the terms thereof. Accordingly, the Institute's third issue is sustained.

For the above reasons, the judgment of the trial court is *reversed and rendered* that Anderson take nothing.