NUMBER 13-02-097-CV
COURT OF APPEALS
THIRTEENTH DISTRICT OF TEXAS
CORPUS CHRISTI – EDINBURG

 
CELANESE, LTD.                                                                       Appellants,
v.
JAMES E. JOHNSTON,                                                                 Appellee.



On appeal from the County Court at Law No 4
of Nueces County, Texas.




M E M O R A N D U M O P I N I O N

     Before Chief Justice Valdez and Justices Rodriguez and Dorsey




                             Opinion by Chief Justice Valdez
       James E. Johnston brought suit against his former employer, Celanese Ltd., for
breach of contract and defamation after Celanese terminated him, putatively on
grounds that Johnston allegedly falsified an expense report. A jury found in favor of
Johnston on the breach of contract and defamation claims, and further found that
Celanese acted with malice regarding the defamation. The trial court entered judgment
in accordance with the verdict. Celanese raises eleven issues on appeal. We reform
the award of exemplary damages against Celanese, and, as reformed, affirm the trial
court's judgment.
         As this is a memorandum opinion and the parties are familiar with the facts, we
will not recite them here except as necessary to advise the parties of the Court’s
decision and the basic reasons for it. See Tex. R. App. P. 47.4. 
Defamation
         Celanese’s fourth, fifth, sixth, seventh, and eighth issues concern the jury’s
findings regarding defamation. The jury found that Celanese’s statements concerning
the termination of Johnston’s employment for “falsification of company documents”
constituted slander per se and libel per se, and further found from “clear and
convincing evidence” that Celanese’s defamatory conduct was performed with actual
malice. 
         In Celanese’s fourth issue, it argues that Johnston cannot recover for
defamation per se given that the statements at issue were subject to a qualified
privilege and there is no evidence of actual malice. In its fifth issue, Celanese asserts
that the evidence is legally and factually insufficient to support the jury’s finding of
actual malice.
         A defamatory statement may be subject to a conditional or qualified privilege,
which arises out of the circumstances in which an allegedly false statement is
published in a lawful manner for a lawful purpose. Hearst Corp. v. Skeen, 130 S.W.3d
910, 926 (Tex. App.–Fort Worth 2004, pet. filed). An interest giving rise to a
qualified privilege may be that of the publisher of the communication, the recipient of
the communication, or a third person. TRT Dev. Co.-KC v. Meyers, 15 S.W.3d 281,
286 (Tex. App.–Corpus Christi 2000, no pet.); Pioneer Concrete of Tex., Inc. v. Allen,
858 S.W.2d 47, 50 (Tex. App.–Houston [14th Dist.] 1993, writ denied). Similarly,
an employer has a conditional or qualified privilege that attaches to communications
made in the course of an investigation following a report of employee wrongdoing. 
Randall's Food Mkts., Inc. v. Johnson, 891 S.W.2d 640, 646 (Tex. 1995); Austin v.
Inet Techs., Inc., 118 S.W.3d 491, 496 (Tex. App.–Dallas 2003, no pet.). The
privilege remains intact as long as communications pass only to persons having an
interest or duty in the matter to which the communications relate. Austin, 118 S.W.3d
at 496.
         In the instant case, the parties stipulated that the communications at issue were
subject to a conditional or qualified privilege. However, a conditional or qualified
privilege is defeated when the privilege is abused, such as when the person making the
defamatory statement acts with actual malice. TRT Dev. Co.-KC, 15 S.W.3d at 286;
Grant v. Stop-N-Go Mkt. of Tex., Inc., 994 S.W.2d 867, 874 (Tex. App.–Houston [1st
Dist.] 1999, no writ); see Hearst Corp., 130 S.W.3d at 926.
         In the context of a defamation claim, actual malice means knowledge of, or
reckless disregard for, the falsity of a statement. Bentley v. Bunton, 94 S.W.3d 561,
591 (Tex. 2002). Reckless disregard is a subjective standard that focuses on the
conduct and state of mind of the defendant. Id. It requires more than a departure
from reasonably prudent conduct, and accordingly, mere negligence is not enough. Id. 
There must be evidence that the defendant in fact entertained serious doubts as to the
truth of his publication or evidence that the defendant actually had a high degree of
awareness of the probable falsity of his statements. Bentley, 94 S.W.3d at 591. Thus,
for example, the failure to investigate the facts before speaking as a reasonably
prudent person would do is not, standing alone, evidence of a reckless disregard for
the truth, but evidence that a failure to investigate was contrary to a speaker's usual
practice and motivated by a desire to avoid the truth may demonstrate the reckless
disregard required for actual malice. Id. 
         A plaintiff is entitled to prove the defendant's state of mind through
circumstantial evidence. Bentley, 94 S.W.3d at 591. The evidence necessary to
prove malice must be “clear and convincing.” See Tex. Civ. Prac. & Rem. Code Ann.
§ 41.003(a)(2) (Vernon Supp. 2004); Forbes, Inc. v. Granada Biosciences, Inc., 124
S.W.3d 167, 171 (Tex. 2003). Clear and convincing evidence is that measure or
degree of proof that will produce in the mind of the trier of fact a firm belief or
conviction as to the truth of the allegations sought to be established. Tex. Civ. Prac.
& Rem. Code Ann. § 41.001(2) (Vernon Supp. 2004); Transp. Ins. Co. v. Moriel, 879
S.W.2d 10, 31 (Tex. 1994).
         We conclude that the jury had before it sufficient clear and convincing evidence
from which it may have inferred that Celanese in fact entertained serious doubts as to
the truth of the publication about Johnston or evidence that Celanese actually had a
high degree of awareness of the probable falsity of the allegations against Johnston.
Bentley, 94 S.W.3d at 591. Therefore, the statements were not subject to a qualified
privilege. 
         Johnston, an engineer who had worked for Celanese for over eighteen years
when he was terminated, was in charge of a “Y2K” project to anticipate problems with
computer systems. He and several other employees worked on the project, which
began in earnest in mid 1999. Johnston’s grandmother became ill in June and he
went to see her in Tennessee. Because it was essential for Johnston to remain in
communication with other project members while away, he took his cellular telephone
and gave the telephone number to them. The cellular telephone he used was in the
name of M & J Photography, a company he and his wife owned. Upon his return,
Johnston requested reimbursement from his supervisor, Ted Bensen, for the cell phone
expenses. Following a series of communications and revisions


 to the original expense
report, Celanese terminated Johnston on grounds that he falsified his expense report. 
         The original expense report comprised $689.09 and was accompanied by the
cell phone bill showing that amount as “roamer charges.” Upon questioning, Johnston
told Bensen that he did not receive an itemization of the calls and he believed that the
roamer charges were incurred because he kept the phone activated, while out of the
calling area, in order to communicate with Celanese employees. Johnston believed
this was an appropriate business expense because he would not have taken the cell
phone with him on his trip but for the need to communicate with team members. 
Johnston told Bensen he believed all expenses were business-related, and that he
would try to obtain a more detailed expense report. 
         Johnston testified he subsequently received the itemized portion of the cell
phone bill which had been forwarded by separate mail from a previous address. He
reviewed the itemized portion of the bill and realized that “roamer charges” were
assigned to different calls. Accordingly, he omitted outgoing calls that were not
Celanese-related, and submitted a second expense report for approximately $300 to
$350. This second report was not kept by Celanese. Johnston included incoming
calls because the itemization did not include phone numbers for those calls and
Johnston believed all incoming calls were business-related. 
         When Johnston submitted the second report, he explained to Bensen that he
had not received the itemized portion of the bill when he submitted the original
expense report. Johnston testified that he told Bensen he had misunderstood what
the roaming charges were and how they were calculated and that he did not realize
that an itemization of calls should have come with the statement, but was delayed. 
Johnston explained his reasoning and calculations for submitting the second report. 
Bensen reviewed the bill and questioned the timing of some of the incoming calls as
being outside of business hours. Johnston replied that “Ted, I’m sorry. I did not
specifically go through and look at dates and times . . . but if you have a problem with
it let me have it back and I’ll just delete them. I mean, I’m not going to argue with you
over them.” Johnston offered to remove even Celanese-related calls if Bensen
questioned them. At trial, Bensen acknowledged Johnston’s offer: “He tried to say
that and I told him that was not what he needed to do. He needed to just take a look
and assess which ones were personal and which ones were business. It was his
responsibility to do that.” Bensen told him to “take a shot” at separating the personal
and business calls. 
         Johnston checked with his wife, who did not recall anyone other than Celanese
employees calling the cell phone. Nevertheless, Johnston again revised the expense
report to what he considered to be the absolute minimum business expenses, and
submitted a final report for $228.73. In reaching this figure, Johnston deleted all
incoming calls from his calculation even though he had unquestionably received
incoming calls for business purposes. Celanese paid this bill. At trial, Johnston
testified that, after further reviewing the bill, he would have been entitled to $417 as
an appropriate business expense.
         After submission of the first expense report, Bensen contacted his supervisor,
Jeff Kirk, with his concern over the amount. Bensen expressed concern that Johnston
had deliberately submitted a false expense statement knowing it included calls that
were not Celanese-related, and Bensen said that Johnston had stated that the report
contained only business-related calls. The next day, August 18, Bensen and Kirk met
with Ken Davis, the director of human resources at the plant, and legal counsel. They
decided to put the question of Johnston’s conduct and future to Darrell Nordeen, the
director of the Celanese facility.
         Nordeen, Bensen, Kirk, Davis, and Bee Schuck, a human resources supervisor
over Bensen’s area of responsibility, met the next day. At this meeting, Bensen relayed
the circumstances surrounding submission of the expense reports, but failed to recount
Johnston’s explanations. Instead, Bensen affirmatively represented to the group that
Johnston had no explanation. According to Nordeen, “[Bensen] said that Jim
Johnston could not and did not–did not offer explanation.” According to the summary
of the meeting wherein Celanese determined to terminate Johnston:
The issue of the sizeable $$ variance between the first and fourth
expense report was discussed. The consensus was that the $$ amount
was of little importance but the fact that Jim had not offered any
plausible explanation caused great concern. That is, when Ted and Jim
discussed the various expense reports, Jim never said that he’d made a
math error, that he misunderstood what Celanese would cover as
business related, that he’d assumed too much. Instead, each time, Jim
had stated verbally and via his signature, that the $$ were business
related and reimbursable to him. 

At this meeting, Bensen unequivocally recommended termination based on the original
report, despite the fact that Bensen expressly viewed the later reports as “works in
progress.” The group agreed, and Bensen and Schuck terminated Johnston on August
24, 1999. 
         After being informed that he was terminated for deliberately falsifying his
expense report, Johnston testified that “I turned to Ms. Schuck and I said, ‘Bee,
you’ve known me for years. This is not deliberate. What is going on here?’ And
she–she turned away and she went, ‘I know.’” Johnston further testified that Schuck
told him “It really doesn’t matter whether it’s deliberate or not.”


 Johnston attempted
to explain the reports, but at some point, Schuck “interceded to stop the explaining.” 
         At trial, Celanese employees generally concurred that if the error in the expense
report had been a mistake or unintentional it would have prevented a finding of
deliberate falsification. Bensen admitted that if Johnston truly believed that the roamer
charges were assessed only on incoming calls, then that would have been a reasonable
explanation for the error on the original report. 
         According to the evidence at trial, Celanese failed to follow its own written
policy regarding the termination of an employee for cause. Celanese contended that
it terminated Johnston under that part of its written policy allowing “immediate
discharge” for “[d]eliberately falsifying records.” However, the written policies
provide, in part, that:
B.If the offense occurs on a night shift, week-end, or holiday, the
supervisor of the offending employee sends the employee home
and instructs him/her to report to the Human Resources
Department normally at 10:00 a.m. on the next work day,
exclusive of Saturday, Sunday, or holiday.
 
C.The department section leader arranges a meeting with a
representative of the Human Resources Department to review the
case.
 
D.Normally at 10:00 a.m. on the next work day, the offending
employee, the supervisor, 2nd level supervisor, department section
leader, and Human Resources representative meet and proceed in
accordance with Paragraphs “E” and “F” below[.]
 
E.The supervisor of the offending employee reports the
circumstances and the employee is given an opportunity to present
facts in the case. 
 
F. After completion of the hearing, the employee’s immediate
supervisor, 2nd level supervisor, section leader and a
representative of the Human Resources Department will
recommend to the employee’s department manager and to the
respective Plant Manager what corrective action should be taken.
 
G. If the disciplinary action is discharge, the department section
leader secures the approval of the department manager, Human
Resources Manager, and the Plant Manager.
 
* * *
 
I.In all cases involving corrective action, timing is important. Once
it has been decided that corrective action may be necessary, the
“fact finding” group will meet within 24 hours. The results of
their findings and recommended action to be taken will be
presented to the employee’s department manager and respective
Plant Manager within 24 hours of the fact finding meeting. 
 
In all corrective action cases, the Plant Manager has the final
approval.
 
An employee shall not be discharged without being notified of the reason
for his/her discharge, and he/she shall be given an opportunity to be
heard in his defense in the presence of his department manager and the
Human Resources Manager.

         The jury may have concluded that Celanese failed to follow this policy with
respect to timing. Despite the policy requirement of moving quickly in cases of serious
infractions, fifteen days elapsed between the submission of the original expense report
on August 9, 1999, and Johnston’s termination on August 24, 1999. 
          More significantly, however, Celanese failed to follow the policy with regard to
its requirement of an investigative fact-finding meeting wherein “[t]he supervisor of the
offending employee reports the circumstances and the employee is given an
opportunity to present facts in the case.” Instead, Johnston was terminated based
solely on Bensen’s version of events, which varied in material respects from
Johnston’s explanation. The jury may have inferred that the failure to allow Johnston
a hearing was deliberate given that Celanese employees were well-aware of the
seriousness of the allegation against Johnston. Nordeen, for instance, admitted he
would not hire an applicant who had been terminated for falsification of documents,
and that such an allegation would be absolutely fatal to any prospect for employment. 
The jury may have drawn similar inferences from the fact that the committee took time
to consult with Celanese’s lawyer, but not with Johnston as its policies required.
         While Bensen testified that he felt no hostility for Johnston, the jury heard
contrary testimony indicating that Bensen was hostile to Johnston. Nan Flaten, who
had animosity towards Johnston, warned Bensen to “watch out” for Johnston when
Bensen became his supervisor. At Bensen’s first meeting with Johnston, Bensen
accused Johnston of handling personal business on company time. Bensen questioned
Johnston about the prudence of using a cell phone to conduct business. Bensen
admitted his mind was made up that Johnston should be terminated when Johnston
submitted the second report. 
         The jury also heard evidence indicating that, although Johnston’s salary had
been included in the budget for the coming year, Celanese was “in a constant mode
of continuing to try to find cost reduction ideas to make sure our businesses can stay
profitable and stay in operation, so there’s always cost reduction initiatives and ideas
being considered.” Bensen and Flaten were specifically working on a cost reduction
project which included personnel reduction. The jury may have inferred that Bensen
and Flaten saw an opportunity to terminate an employee they did not like and at the
same time promote a cost cutting project under their management. 
         Ultimately, the jury may have concluded that some of Celanese’s actions were
inconsistent with its contention that the original report was deliberately falsified. The
jury is the sole judge of the credibility of the witnesses, and could have believed
Johnston’s testimony regarding the expense report rather than the testimony of the
witnesses for Celanese. Silcott v. Oglesby, 721 S.W.2d 290, 293 (Tex. 1986);
Gorges Foodservice, Inc. v. Huerta, 964 S.W.2d 656, 666 (Tex. App.–Corpus Christi
1997, no writ). The jury’s verdict was supported by more than a scintilla of evidence,
and was not so against the great weight and preponderance of the evidence as to be
manifestly unjust. Maritime Overseas Corp., 971 S.W.2d at 406-07. We conclude
that Johnston presented legally and factually sufficient evidence to support the jury’s
finding that Celanese defamed Johnston and that the defamation was motivated by
malice. Celanese’s fourth and fifth issues are overruled.
         In its sixth issue, Celanese contends that Johnston’s defamation claim must fail 
because truth is an absolute defense. We agree that truth is a defense to defamation. 
See Tex. Civ. Prac. & Rem. Code Ann. § 73.005 (Vernon 1997). The statement need
not be true in every detail; substantial truth is sufficient to establish the defense. 
McIlvain v. Jacobs, 794 S.W.2d 14, 15-16 (Tex. 1990). Given the conflicting
testimony from Johnston and the Celanese witnesses, the jury could determine that
Celanese’s statements regarding Johnston’s alleged falsification of company
documents were not substantially true. We are not at liberty to substitute our
judgment for that of the jury. See Pool v. Ford Motor Co., 715 S.W.2d 629, 634
(Tex. 1986). Accordingly, we overrule the sixth issue.
         Celanese argues in its seventh issue that Johnston’s claim for libel per se must
fail on grounds that there is no evidence that a document stating that Johnston
falsified company documents was ever published to a third party. 
         As an initial matter, we note that Celanese does not raise an issue regarding
Johnston’s claim for slander per se. In the instant case, the alleged publications
occurred both orally and in written format. The oral statements that constitute
Johnston’s slander claim were made on several occasions. First, Johnston’s
supervisor, Bensen, told Kirk, who told Davis and Nordeen. Bensen then met with
Kirk, Davis, Nordeen, Schuck, and an attorney. The following day, the same
committee met and voted to terminate Johnston. 
         Moreover, following Johnston’s termination, Davis, the human resources
manager, spoke with his human resources representatives “in an educational way and
shared with them the facts of the case,” specifically identifying Johnston by name. 
According to Davis, there were new employees at that meeting, and at least one
employee who did not know Johnston. Davis conceded he did not need to name
Johnston by name to get his point across. 
         Statements are considered published, even if they are made only to other
employees or managers. See Stephens v. Delhi Gas Pipeline Corp., 924 S.W.2d 765,
769 (Tex. App.–Texarkana 1996, writ denied). We conclude that there is sufficient
evidence to support a claim for slander per se, and the judgment can rest on that
alone.
         However, even if we were required to examine the record for evidence
supporting the jury’s findings of libel per se, we would reach a similar result. In terms
of written documentation, the allegations were made in Johnston’s personnel file,
Nordeen’s letter of termination, minutes of meetings and notes, and in submissions to
the Texas Workforce Commission. Celanese, the appellant with the burden of proof
on this issue, has neither argued nor cited any authority indicating that such
submissions do not qualify as libelous publications.
         We conclude that the communications that Johnston deliberately falsified
documents constitute publication of the defamation. The defamation was
communicated within the company, even following the investigation and Johnston’s
termination, and without the company to the Texas Workforce Commission. We
overrule Celanese’s seventh issue. 
         Celanese argues in its eighth issue that Johnston cannot prevail on his claims
because Johnston obtained a new job shortly after the termination and no prospective
employer testified to knowledge of the defamatory statements. This argument is
premised on Reeves v. Western Co. of N. Am., 867 S.W.2d 385, 395 (Tex. App.–San
Antonio 1993), overruled on other grounds, Cain v. Hearst Corp., 878 S.W.2d 577
(Tex. 1994). In Reeves, a job applicant sued his potential employer for defamation
after he was denied employment for testing positive for alcohol use. 
         Reeves is distinguishable from the instant case. In Reeves, there was no
evidence that the defamatory statements were published. See id. Instead, the
applicant argued that he would be compelled to tell other prospective employers of the
defamation. In affirming the trial court’s ruling against the applicant, the court of
appeals found no evidence of “compelled self-publication,” and stated that
“Speculation about possible consequences if a prospective employer knew Reeves did
not pass the alcohol test will not support this claim.” See id. 
         In the instant case, the record contains evidence that the defamatory statements
were published, and, accordingly, this case does not rely on speculative issues
regarding self-publication. The eighth issue is overruled.
                                                    Damages
         Celanese’s final three issues attack the jury’s award of damages. In its ninth
issue, Celanese asserts that the jury’s award of $250,000 in general damages for the
defamation was not supported by legally or factually sufficient evidence and was
excessive.
         In a case of slander or libel per se, no independent proof of damage to the
plaintiff's reputation or of mental anguish is required because the defamation itself
gives rise to a presumption of these damages. See Leyendecker & Assocs., Inc. v.
Wechter, 683 S.W.2d 369, 374 (Tex. 1984); Peshak v. Greer, 13 S.W.3d 421, 427
(Tex. App.–Corpus Christi 2000, no pet.); Wal-Mart Stores, Inc. v. Odem, 929 S.W.2d
513, 527 (Tex. App.–San Antonio 1996, writ denied). Damages resulting from
slander are purely personal and cannot be measured by any fixed rule or standard, and
the amount awarded rests largely in the discretion of the jury. See Fontenot
Petro-Chem & Marine Servs. v. Labono, 993 S.W.2d 455, 459 (Tex. App.–Corpus
Christi 1999, pet. denied); Wal-Mart Stores, Inc., 929 S.W.2d at 527; Shearson
Lehman Hutton, Inc. v. Tucker, 806 S.W.2d 914, 924 (Tex. App.–Corpus Christi
1991, writ dism'd w.o.j.). In such a case, we will not disturb a jury's award of actual
damages unless the record indicates the award was excessive or was the result of
passion, prejudice, or other improper influence. Wal-Mart Stores, Inc., 929 S.W.2d
at 527. In the instant case, the record is devoid of any such indication. Moreover, the
damages awarded are well within the range of damages previously upheld by this
Court for defamation. See, e.g., Shearson Lehman Hutton, Inc., 806 S.W.2d at 924;
(upholding damages of $317,191.66); Vista Chevrolet, Inc. v. Barron, 698 S.W.2d
435, 443 (Tex. App.–Corpus Christi 1985, no writ) (upholding damages of
$500,000). Accordingly, we decline to disturb the jury’s award. We overrule
Celanese’s ninth issue.
         In its tenth issue, Celanese asserts the evidence is legally and factually
insufficient to support the exemplary damages awarded. Celanese argues that the
exemplary damages awarded do not relate to the nature of the wrong allegedly
committed, the extent or type of harm resulting from such conduct, the character of
the alleged conduct, or the degree of culpability.
         In the instant case, the jury awarded $1,500,000 as exemplary damages. The
trial court reduced this award pursuant to statute, and the judgment awarded Johnston
exemplary damages in an amount equal to non-economic damages of $250,000, plus
twice the economic damages of $32,250, for a total of $314,500. See Tex. Civ.
Prac. & Rem. Code Ann. § 41.008 (Vernon Supp. 2004). 
         We review the excessiveness of an exemplary damages award under state law
as a factual sufficiency challenge. Maritime Overseas Corp. v. Ellis, 971 S.W.2d 402,
406 (Tex. 1998); Baribeau v. Gustafson, 107 S.W.3d 52, 61 (Tex. App.–San Antonio
2003, pet. denied). We may only reverse if the exemplary damages award is so
against the great weight and preponderance of the evidence as to be manifestly unjust.
Transportation Ins. Co. v. Moriel, 879 S.W.2d 10, 30 (Tex. 1994); Baribeau, 107
S.W.3d at 61. No set rule or ratio between actual and exemplary damages exists
which would indicate that the exemplary damages awarded in this case were
excessive. Alamo Nat'l Bank v. Kraus, 616 S.W.2d 908, 910 (Tex. 1981). Factors
we consider in determining the reasonableness of an award include: (1) the nature of
the wrong; (2) the character of the conduct involved; (3) the degree of culpability of
the wrongdoer; (4) the situation and sensibilities of the parties concerned; and (5) the
extent to which conduct offends a public sense of justice and impropriety. Tex. Civ.
Prac. & Rem. Code Ann. § 41.011 (Vernon 1997); Kraus, 616 S.W.2d at 910 
         Johnston, an employee of eighteen year’s duration, was terminated for cause
on grounds he deliberately falsified company documents. Celanese witnesses
conceded that this was a serious allegation that would potentially eliminate Johnston’s
future job possibilities. Celanese admitted it would not hire someone who had been
charged with such conduct. Johnston testified that the charge jeopardized his
professional designation as an engineer. One of Johnston’s colleagues testified that
this incident damaged Johnston’s professional reputation. 
         In terms of the specific document that was allegedly falsified, the expense
report, the jury may have considered that the expenses were incurred as a result of
Johnston’s performance of work for Celanese, without compensation, while on leave
to see his dying grandparent. Further, Johnston was terminated based on his initial
expense report even though subsequent reports were treated as “works in progress.” 
The evidence indicated that Johnston repeatedly revised the report while consistently
offering to eliminate unacceptable charges. In fact, under the evidence adduced at
trial, Johnston’s final expense report underestimated his actual expenses by some
$188.27. 
         The jury further heard evidence that Celanese failed to follow its own policies
and procedures with regard to investigating Johnston’s alleged misconduct. Celanese
failed to give Johnston the required notice or hearing regarding the allegedly falsified
expense report. Perhaps it was significant to the jury that Celanese instead took time
to include the company lawyer in the meetings preceding Johnston’s termination.
Celanese made its determination to terminate Johnston based solely on Bensen’s
recommendation. Bensen did not convey Johnston’s explanation regarding the error
to the other Celanese employees, and told them, to the contrary, that Johnston offered
no explanation. Celanese witnesses admitted that it would not be grounds for
termination if Johnston had merely made a mistake on the expense report. The jury
had sufficient evidence before it to conclude that a Celanese witness thought that
Johnston had made a mistake on his expense report, but nonetheless proceeded with
termination for intentional falsification of a company document. 
         The jury was properly instructed on the Kraus factors, and the record contains
competent evidence to support the award. We hold that the evidence is factually
sufficient to support the award. Evidence which is factually sufficient is necessarily
legally sufficient. Baribeau, 107 S.W.3d at 63. We overrule Celanese’s tenth issue.
         In its eleventh and final issue, Celanese asserts the award of $314,500 in
exemplary damages is excessive and is erroneous because it includes the breach of
contract award. We have already addressed Celanese’s argument that the exemplary
damages awarded are excessive and need not further address that argument herein. 
However, we agree with Celanese’s remaining argument that exemplary damages may
not be awarded for breach of contract. 
         Exemplary damages are not recoverable in a breach of contract action. See
Twin City Fire Ins. Co. v. Davis, 904 S.W.2d 663, 665 (Tex. 1995) (breach of
contract alone will not support punitive damages; existence of independent tort must
be established). Therefore, “it follows that economic damages arising from a breach
of contract may not be used to increase the statutory cap under section 41.008.” 
Signal Peak Enters. of Tex., Inc. v. Bettina Invs., Inc., 138 S.W.3d 915, 928 (Tex.
App.–Dallas 2004, no pet. h.). 
         Accordingly, the exemplary damages awarded should not include economic
damages awarded on Johnston’s breach of contract claim. The trial court's judgment
should be reformed to reflect an award of exemplary damages against Celanese of
$250,000.00. See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b)(1)(A) (Vernon
Supp. 2004). We sustain Celanese’s eleventh issue.
                                             Breach of Contract
         Celanese’s first three issues on appeal concern the jury’s award of separation
pay to Johnston. The jury found that Celanese and Johnston agreed that, in the event
of termination “without cause,” he would be provided separation pay, and Celanese
failed to comply with this agreement. Johnston was awarded $32,250 for separation
pay.


 
         Celanese contends that (1) its separation pay policy is not a contract, (2) the
statute of frauds precludes Johnston’s oral claim for breach of contract, and (3)
Johnston was ineligible to receive separation pay under any alleged contract. 
Johnston does not dispute that Celanese had the right to terminate his employment
at any time for any reason, but he asserts that he was entitled to separation pay if he
was discharged without just cause. 
         In its first issue, Celanese asserts that its separation pay policy is not a contract,
and accordingly, it may not be held liable for any alleged breach thereof. Celanese
relies on authority holding that provisions of an employee handbook do not create
property rights or an alteration of an employee’s at-will status. See Guinn v. Bosque
County, 58 S.W.3d 194, 201 (Tex. App.–Waco 2001, pet. denied). Without doubt,
“[i]n an employment-at-will relationship, either party may modify the employment
terms as a condition of continued employment.” Werden v. Nueces County Hosp.
Dist., 28 S.W.3d 649, 652 (Tex. App.–Corpus Christi 2000, no pet.) (quoting Gamble
v. Gregg County, 932 S.W.2d 253, 256 (Tex. App.–Texarkana 1996, no writ)). 
Here, however, modification of the at-will employment status of Johnston is not at
issue; rather, the sole issue is whether Celanese was required to pay Johnston
separation pay if it discharged him without good cause.
         Although an at-will employment relationship allows either party to end it without
penalty, the employee is entitled to be paid for labor performed prior to termination. 
Harrison v. Gemdrill Intern., Inc., 981 S.W.2d 714, 718 (Tex. App.–Houston [1st
Dist.] 1998, pet. denied); see Tex. Lab. Code Ann. § 61.019 (Vernon Supp. 2004). 
Similarly, he is entitled to other benefits he was promised and in existence during his
employment and when it ended, even though the employer may have retained the right
to modify those benefits. Hamby Co. v. Palmer, 631 S.W.2d 589, 591 (Tex.
App.–Amarillo 1982, no writ); see Tex. Lab. Code Ann. § 61.001 (Vernon 1996). 
         Johnston testified that when he was initially offered employment with Celanese,
he was told he would be entitled to separation pay if he were to be involuntarily
terminated without cause. He testified that the separation pay policy was one of the
reasons he accepted employment with Celanese. 
         Celanese’s plant manager, Darrell Nordeen, and its human resources director,
Ken Davis, agreed that Celanese’s separation pay policy had not changed since
Johnston was employed. All of the witnesses for Celanese admitted Johnston would
have been entitled to separation pay if Celanese had fired him without good cause, and
that the only reason Johnston was not paid separation pay was because he was
terminated for falsification of company documents. Accordingly, we conclude that
Johnston was entitled to separation pay. We overrule Celanese’s first issue.
         According to Celanese’s second issue, any alleged contract for separation pay
violates the statute of frauds because it is not to be performed within one year and
therefore cannot be enforced. Tex. Bus. & Com. Code Ann. § 26.01 (Vernon 1997). 
However, the evidence of such an agreement consists of Johnston’s testimony, that
of various Celanese officials, including members of the human resource department,
and the written policy manual of the company. The purpose of the statute’s
requirement of a writing is to provide written evidence of the obligation, and may
consist of letters or other written memoranda from the person sought to be bound. 
Adams v. Abbott, 151 Tex. 601, 254 S.W.2d 78, 80 (Tex. 1952); EP Operating Co.
v. MJC Energy Co., 883 S.W.2d 263, 267 (Tex. App.–Corpus Christi 1994, writ
denied). We hold the Celanese policy manual serves as sufficient written evidence of
the separation pay policy to satisfy the statute of frauds. We overrule Celanese’s
second issue.
         In its third issue, Celanese argues that Johnston did not qualify for separation 
pay under the criteria of the policy manual. The separation pay policy sets out the
circumstances under which an employee involuntarily terminated would be entitled to
separation pay. They are (1) lack of work, (2) shutdown of facilities, (3) sale of all or
part of a business, and (4) inability to perform required duties. Nevertheless, in
modification of the restrictive terms of the written policy, witnesses for Celanese
uniformly testified that Johnston would have received separation pay had he not been
terminated for cause. Bee Shuck, a human resources partner for Celanese, testified
that she had never known a full-time salaried Celanese employee with more than one
year of continuous service who was terminated without cause who did not receive
separation pay. Ken Davis, the head of the human resources department, testified
that every employee who had ever been terminated without cause received separation
pay. The report of Johnston’s termination maintained in the personnel files states that
separation pay and accrued vacation are given only when an employee is terminated
without cause. We conclude that there is sufficient evidence that Johnston would
have qualified for separation pay had he been terminated without cause. Celanese’s
third issue is overruled.
Conclusion
         We sustain Celanese’s eleventh issue as stated previously. We overrule all of
Celanese’s remaining issues. We reform the trial court's judgment to reflect an award
of exemplary damages of $250,000. We affirm the trial court's judgment in all other
respects.
 


                                                                                                                   
                                                                        Rogelio Valdez,
                                                                        Chief Justice

 

 Memorandum Opinion delivered and filed
this 27th day of January, 2005.